[No. D058385. Fourth Dist., Div. One. Feb. 7, 2012.]

THE PEOPLE, Plaintiff and Respondent, v.
GREGORY LEE LATHAM et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION***]**

---

*Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication, with the exception of parts III.B. and III.C.

**COUNSEL**

Thomas Owen, under appointment by the Court of Appeal, for Defendant and Appellant Gregory Lee Latham.

Patricia Ann Scott, under appointment by the Court of Appeal, for Defendant and Appellant Yvonne Dee Latham.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons and Peter Quon, Jr., Assistant Attorneys General, Steve Oetting and Andrew Scott Mestman, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**AARON, J.—**

I.

INTRODUCTION

A jury found Gregory Lee Latham (Gregory) and Yvonne Dee Latham (Yvonne) guilty of the second degree murder of their 17-year-old daughter, Nanette Latham (Nanette) (Pen. Code, §§ 187, subd. (a), 189) (count 1).[1] The jury also found appellants guilty of child endangerment (§ 273a, subd. (a)) (count 2).[2] In addition, with respect to count 2, the jury found that appellants committed the offense under circumstances specified in section 12022.95.[3] Nanette, who suffered from type 1 diabetes, died from complications related to the disease.[4] At trial, the People presented evidence that appellants acted with conscious disregard for Nanette's life by failing to obtain medical treatment for her in the days preceding her death.

---

[1] All subsequent statutory references are to the Penal Code, unless otherwise specified.

[2] Nanette was also the victim in the child endangerment charge (count 2).

[3] Section 12022.95 provides in relevant part: "Any person convicted of a violation of Section 273a, who under circumstances or conditions likely to produce great bodily harm or death, willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or injury that results in death, or having the care or custody of any child, under circumstances likely to produce great bodily harm or death, willfully causes or permits that child to be injured or harmed, and that injury or harm results in death, shall receive a four-year enhancement for each violation, in addition to the sentence provided for that conviction."

[4] Gregory also pled guilty to using a minor to transport or sell methamphetamine (Health & Saf. Code, § 11353) (count 3). No evidence related to this offense was presented at appellants' jury trial, and Gregory raises no contention as to this conviction on appeal.

Appellants contend that there is insufficient evidence to support the jury's verdicts finding them guilty of second degree murder. Specifically, appellants contend that the record lacks sufficient evidence from which the jury could have found that they knew that their failure to obtain medical treatment for Nanette endangered her life or that they failed to obtain such medical treatment in conscious disregard for Nanette's life, both of which the jury had to impliedly find in order to convict appellants of second degree murder. We affirm the judgment.[5]

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *The trial*

#### 1. *The prosecution's evidence*

##### a. *Nanette's prior medical treatment for diabetes*

In December 2001, Nanette was admitted to the emergency room after she displayed "an altered level of consciousness." She was diagnosed as suffering from diabetes mellitus, type 1, and diabetic ketoacidosis.[6] Diabetic ketoacidosis is a complication related to diabetes that occurs when the body fails to produce adequate amounts of insulin. While the condition can be fatal, most cases of diabetic ketoacidosis are treatable and the patient recovers. Nanette's symptoms included Kussmaul breathing[7] and "fruity breath," a sign of acetone on the breath.

Medical records from Nanette's 2001 hospitalization indicated that appellants were provided with education related to the management of Nanette's diabetic condition at that time. This education would have included instruction as to how to recognize the symptoms of diabetic ketoacidosis. The medical records state that appellants did "not grasp[] [the] seriousness of [Nanette's] . . . condition," and that they displayed "ignorance and [a] lack of comprehension of how close their daughter came to dying."

---

[5] Appellants also claim that the trial court abused its discretion in failing to sufficiently investigate a juror's comment that allegedly suggested potential juror misconduct and in denying appellants' motion to disclose personal juror information to investigate such potential misconduct. We reject these claims in the unpublished portions of this opinion.

[6] At trial, the condition was referred to as either diabetes ketoacidosis or diabetic ketoacidosis. For purposes of clarity, we use the term diabetic ketoacidosis throughout this opinion.

[7] Ramon Jaraba, a registered nurse who treated Nanette prior to her death in 2006, testified that Kussmaul breathing is "very deep, rapid breathing."

After her diagnosis, Nanette was primarily responsible for managing her own diabetic condition. She monitored her blood sugar and injected herself with insulin, as needed. Gregory, who had type 2 diabetes, sometimes assisted Nanette in the management of her diabetes.

In 2004, Nanette was taken to a medical office after she became lethargic and unresponsive. Yundell Montalbo, a physician's assistant, diagnosed Nanette as having low blood sugar. Montalbo believed that Nanette was going into a coma and that she required hospitalization. An ambulance was summoned. An emergency medical technician provided Nanette with glucose, and her blood-sugar level began to rise. Yvonne decided not to allow Nanette to be taken to the hospital in the ambulance, and Nanette was not hospitalized on this occasion.

### b. *Nanette's illness in April 2006*

In April 2006, Nanette became ill and displayed the symptoms of diabetic ketoacidosis. Over a period of approximately a week prior to April 15, Nanette's physical condition deteriorated. She became immobile, began to breathe heavily, complained of pain to her lungs and ribs, and appeared to be semiconsciousness or unconscious for periods of time. In the days just prior to April 15, neighbors urged the appellants to obtain medical treatment for Nanette. Appellants did not obtain any medical treatment for Nanette prior to April 15.

### c. *Nanette's hospitalization and death*

On April 15, the Lathams' neighbor, Linda Conner, heard Yvonne screaming, "I think Nanette died. I think Nanette is dead." Another neighbor, Jesse Wallis, called 911 after learning that Nanette had stopped breathing. Paramedics arrived at appellants' residence at approximately 12:39 p.m. Upon their arrival, paramedics determined that Nanette was in cardiac arrest, meaning that she was not breathing and her heart was not beating. Paramedics rushed Nanette to the hospital. Hospital personnel drew Nanette's blood approximately 10 minutes after her arrival. Nanette's blood-sugar level was 1297, which is roughly 15 times the normal level.

On April 17, 2006, physical examinations showed that Nanette had no brain activity and that she met the criteria for brain death. Doctors pronounced her dead at 6:30 p.m. that evening. Nanette remained on a ventilator until the following day in order to afford appellants the opportunity to visit her. Appellants visited Nanette briefly on April 18. Minutes after appellants' visit, doctors removed Nanette from "organ support," and all respiration and cardiac activity ceased. A forensic pathologist determined that Nanette died as a result of diabetic ketoacidosis.

#### d. *Expert testimony concerning diabetic ketoacidosis*

Pediatric endocrinologist Dr. John Mace testified concerning diabetes and diabetic ketoacidosis. Dr. Mace explained that there are two types of diabetes—type 1 and type 2. In persons suffering from type 1 diabetes, the body does not produce enough insulin, a hormone made in the pancreas that lowers the body's blood sugar. Diabetic ketoacidosis occurs when the body is not getting enough insulin and begins to burn fat. When the body burns fat, it produces ketoacids. Individuals who are suffering from diabetic ketoacidosis will breathe "fast and hard" in an effort to rid their bodies of the acid. Dr. Mace described that breathing as follows, "It would be like you just ran a race, and so you would be breathing that hard." Unless a person suffering from diabetic ketoacidosis receives insulin, his or her body will become progressively acidotic, and his or her brain will cease to function properly. If untreated, a person suffering from diabetic ketoacidosis will become comatose, stop breathing, and die.

Dr. Mace also testified that a blood-sugar level of 1297 is "very high" and that with a blood-sugar level this high, Nanette would have been "acutely ill" and would have gone into cardiac arrest.

#### 2. *The defense*

##### a. *Gregory's defense*

Endocrinologist Dr. Steven Schessler testified concerning diabetes and diabetic ketoacidosis. Dr. Schessler explained the differences between type 1 and type 2 diabetes, and stated that a person who suffers from type 2 diabetes and who has not had specialized training regarding type 1 diabetes might incorrectly treat a type 1 diabetic. Dr. Schessler also explained that some diabetics can have normal blood-sugar levels, yet be acidotic. Dr. Schessler also agreed with defense counsel that it would be "possible" for a person's blood-sugar level to rise from 300 to 1200 in 12 hours.

Appellants' daughter, Heidi, testified that Nanette was sick for "about three days" prior to April 15. During those three days, Heidi saw Nanette only twice. Nanette appeared sick and told Heidi that she had a stomach ache. On the second day that Nanette was sick, Nanette asked Heidi for some water. Heidi saw Gregory attempt to give Nanette pizza and a yogurt drink, but Nanette pushed them away. Heidi also saw Gregory check Nanette's blood-sugar level.

The paramedics took Nanette to San Gorgonio Memorial Hospital. Heidi and Yvonne went there to see her. After Nanette was transferred to Loma

Linda Hospital, Heidi went with Gregory and Yvonne to see Nanette. According to Heidi, at the hospital, Gregory was yelling and "in a rage" because "they wanted him to pull the plug."

Heidi stated that approximately two months prior to Nanette's death, Yvonne was attacked by a man who kicked her in the head with steel-toed boots and stabbed her with keys. After the attack, Heidi could see that Yvonne had bruises on her head and chest and cuts on her arms, shoulders, and face. Yvonne was taken by ambulance to the hospital. After this incident, Yvonne appeared "sad" to Heidi. Yvonne told Heidi that she was "messed up" from the attack.

### b. *Yvonne's defense*

Appellants' son, Gregory Latham, Jr. (Gregory Jr.), testified that sometime prior to February 2006, he witnessed a man attack Yvonne.[8] Gregory Jr. saw the man "stomping" on Yvonne's head. Yvonne had "lumps all over her head" as a result of the attack. Gregory Jr. also was "pretty sure [Yvonne] was bleeding" as a result of the attack.

On the morning that paramedics took Nanette to the hospital, Gregory Jr. heard Yvonne screaming as if she were "frantic about something." Yvonne told Gregory Jr. that Nanette had stopped breathing. Gregory Jr. performed cardiopulmonary resuscitation on Nanette. Yvonne was crying and appeared "really stressed out" and "[r]eally worried."

### 3. *The verdicts*

The jury found Gregory and Yvonne guilty of second degree murder (§§ 187, subd. (a), 189) (count 1) and child endangerment (§ 273a, subd. (a)) (count 2). The jury also found that appellants committed count 2 under circumstances specified in section 12022.95. (See fn. 3, *ante*.)

## B. *Sentencing*

The trial court sentenced Gregory to an aggregate term of 17 years to life in prison. On count 1, the court sentenced Gregory to 15 years to life. On count 2, the court sentenced Gregory to 10 years in prison, consisting of the upper term of six years on the underlying count (§ 273a, subd. (a)) and four years for the section 12022.95 enhancement. The court stated that the term on count 2 was to be served concurrently with the term imposed on count 1, and stayed execution of the sentence on count 2 pursuant to section 654. On count

---

[8] Gregory Jr. testified that he was uncertain exactly when the attack occurred.

3, the court sentenced Gregory to two years in prison, to be served consecutively to the term imposed on count 1.

The trial court sentenced Yvonne to an aggregate term of 15 years to life in prison. On count 1, the court sentenced Yvonne to 15 years to life. On count 2, the court sentenced Yvonne to eight years in prison, consisting of the middle term of four years on the underlying count (§ 273a, subd. (a)) and four years for the section 12022.95 enhancement. The court stated that the term on count 2 was to be served concurrently with the term imposed on count 1, and the court stayed execution of the sentence on count 2 pursuant to section 654.

III.

DISCUSSION

A.  *There is sufficient evidence in the record to support the jury's verdicts finding appellants guilty of second degree murder*

Appellants contend that there is insufficient evidence in the record to support the jury's verdicts finding them guilty of second degree murder (§§ 187, subd. (a), 189).

1.  *Governing law and standard of review*

a.  *Sufficiency of the evidence*

"A state court conviction that is not supported by sufficient evidence violates the due process clause of the Fourteenth Amendment and is invalid for that reason." (*People v. Rowland* (1992) 4 Cal.4th 238, 269 [14 Cal.Rptr.2d 377, 841 P.2d 897], citing *Jackson v. Virginia* (1979) 443 U.S. 307, 313–324 [61 L.Ed.2d 560, 99 S.Ct. 2781].) In determining the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia, supra,* at p. 319.) "[T]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738].) "The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11 [82 Cal.Rptr.2d 413, 971 P.2d 618].)

### b. *The elements of second degree murder*

Section 187 provides in relevant part, "(a) Murder is the unlawful killing of a human being . . . with malice aforethought." Section 188 defines malice as follows:

"Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart.

"When it is shown that the killing resulted from the intentional doing of an act with express or implied malice as defined above, no other mental state need be shown to establish the mental state of malice aforethought. Neither an awareness of the obligation to act within the general body of laws regulating society nor acting despite such awareness is included within the definition of malice."

■ In *People v. Chun* (2009) 45 Cal.4th 1172, 1181 [91 Cal.Rptr.3d 106, 203 P.3d 425] (*Chun*), the Supreme Court observed, "[T]he statutory definition [of implied malice] permits, even requires, judicial interpretation." The *Chun* court summarized its interpretation of that term as follows: "We have interpreted implied malice as having 'both a physical and a mental component. The physical component is satisfied by the performance of "an act, the natural consequences of which are dangerous to life." [Citation.] The mental component is the requirement that the defendant "knows that his conduct endangers the life of another and . . . acts with a conscious disregard for life." [Citation.]' [Citation.]" (*Ibid.*)

■ A parent owes his or her child a duty to obtain needed medical attention. (*People v. Burden* (1977) 72 Cal.App.3d 603, 614 [140 Cal.Rptr. 282] (*Burden*); accord, § 270.) ■ The "omission of a duty is in law the equivalent of an act . . ." (*Burden, supra,* at p. 616), and thus, a defendant's failure to perform an act that he or she has a legal duty to perform is identical to the defendant's affirmative performance of an act (*id.* at p. 618 ["common law does not distinguish between homicide by act and homicide by omission"]; see CALCRIM No. 520 ["If you conclude that the defendant owed a duty to <insert name of decedent>, and the defendant failed to perform that duty, (his/her) failure to act is the same as doing a negligent or injurious act."]).

### 2. *Application*

Appellants contend that the record lacks sufficient evidence from which the jury could have found that they knew that their failure to obtain medical

treatment for Nanette endangered her life or that they failed to obtain such medical treatment in conscious disregard for Nanette's life.[9]

    a.   *There is sufficient evidence from which a jury could have found that appellants harbored the requisite mental state to be found guilty of implied malice murder*

There are four categories of evidence in the record that support the jury's implied finding that appellants acted with implied malice. Below, we discuss each of these categories and explain how the cumulative weight of the evidence is sufficient to support the jury's verdicts.

    i.   *Nanette's medical condition in the days prior to her death*

Conner testified that approximately five days before paramedics rushed Nanette to the hospital, Conner saw Nanette lying on the couch, "completely out of it." Conner shook Nanette, but was unable to awaken her. Approximately three days before Nanette suffered cardiac arrest and was transported to the hospital, Wallis saw Nanette lying on the bed, moaning, in a drowsy, semiconscious state.[10] The next day, Wallis observed Nanette lying on the bed in the same condition. On the day before Nanette suffered cardiac arrest, Wallis testified that Nanette appeared "out of it." Wallis stated that Nanette was unable to sit up on her own and that she was "really weak." Wallis watched Gregory attempt to pour some yogurt into Nanette's mouth while propping her up with his arms. According to Wallis, the yogurt was "running down [Nanette's] chin."

Appellants' daughter, Carra,[11] testified that Nanette became sick a week before she was taken to the hospital.[12] During that week, Nanette looked weak, "got real skinny," could not "really" walk, and did not want to drink or eat. In addition, during an interview that a police investigator conducted with Carra on April 25, 2006, 10 days after Nanette was hospitalized, Carra stated that Nanette had told her and appellants' other daughter, Carol, that Nanette's ribs "hurt bad," and that "her lungs hurted [*sic*]." Carra also told the

---

  [9] Appellants do not dispute that the jury was properly instructed on second degree murder pursuant to an implied malice theory. In addition, appellants do not dispute that their "failure . . . to take Nanette to the doctor before she lapsed into a coma and cardiac arrest was a life-endangering act." Thus, we address only whether there is sufficient evidence that appellants harbored the requisite mental state for implied malice murder.

  [10] Wallis testified, "Well, it was kind of like she was awake, but she wasn't, you know, she was like she was talking in her sleep, you know, kind of."

  [11] Carra's real first name is Yvonne. However, at trial, she was referred to by her nickname, "Carra." For purposes of clarity, we refer to her as Carra in this opinion.

  [12] Carra was 16 years old at the time of appellants' trial.

investigator, "Carol said [Nanette's] lungs are probably shutting down or something." In addition, Carra told the investigator that Carol told Yvonne that Nanette had said her ribs and lungs hurt.

Carol testified that Nanette got sick "about a week" before she was taken to the hospital.[13] According to Carol, as the week progressed, Nanette "wasn't responding to anybody's answer [*sic*]." Carol explained, "[S]he would barely, like, say 'yes' or 'no.'" Carol said that Nanette was "barely" able to stand up and walk. Carol also noted that Nanette was unable to use the restroom, and that Yvonne had put a diaper on Nanette. Moreover, according to Carol, Nanette was "breathing hard" in the "couple of days" prior to being hospitalized. Carol had heard Nanette breathe in a similar fashion at the time Nanette was initially diagnosed with diabetes. Carol also testified that Nanette said that her ribs hurt.

Nathan Buddruis, one of the paramedics who took Nanette to the hospital, testified that when he saw Nanette being removed from appellants' residence, "she appeared to . . . be possibly a very old woman that could have been maybe 70 years old, just by judging by the look of her skin, and her eyes and her face and the fact that she was in a diaper." Paramedics determined that Nanette was in cardiac arrest, and emergency room personnel discovered that Nanette was unresponsive to any stimuli and that her blood-sugar level was extremely high.

In addition to evidence pertaining to Nanette's medical condition in the days preceding her death, the record also contains expert testimony concerning the symptoms that a patient suffering from diabetic ketoacidosis would ordinarily display in the 24 hours prior to cardiac arrest and death. Dr. Mace testified that such a patient would engage in extremely heavy breathing for a period of approximately 24 hours prior to suffering cardiac arrest. The prosecutor asked Dr. Mace, "The heavy breathing that you have described, is that something most people would recognize as a problem?" Dr. Mace responded in the affirmative. Dr. Mace provided a demonstration of this type of breathing while on the witness stand, which the court described as follows: "[T]he witness is taking extremely deep breaths, utilizing the shoulders and chest extensively."[14] In addition, Dr. Mace testified that a patient who ultimately suffered cardiac arrest caused by diabetic ketoacidosis would have become "progressively less aware and gradually slip[ped] into coma" during the 24-hour period prior to suffering cardiac arrest and death.

---

[13] Carol was 18 years old at the time of appellants' trial.

[14] In addition, Jaraba agreed with the prosecutor that deep breathing caused by diabetic ketoacidosis is "a pretty obvious condition."

ii. *Appellants had received training on recognizing the symptoms of diabetic ketoacidosis*

At the time of Nanette's 2001 hospitalization, appellants received training in the management of diabetes. This training included instruction concerning how to recognize the symptoms of diabetic ketoacidosis, including "Kussmaul breathing," "acetone on the breath,"[15] and "mental stupor."

iii. *Neighbors told appellants that Nanette should receive medical attention*

On at least three separate occasions during the four days before Nanette suffered cardiac arrest, Conner told Gregory that "[she] wished they . . . would call the paramedics." Conner told Yvonne "the same thing." Conner was worried that Nanette might be in "a coma."

Two days prior to Nanette's hospitalization, neighbor Anthony Costa visited Nanette and appellants. After hearing Nanette make a moaning sound as if she were in pain, Costa offered to drive the family to a doctor's office or to the hospital. Gregory responded, "No, it's okay. She is all right. She will be all right."

On the day before Nanette suffered cardiac arrest, Wallis told both appellants that Nanette "didn't look real good at all, that she should be taken to a hospital." Wallis said that appellants "kind of just looked at [him]," and that he "told them that if they didn't take her to the hospital, [he] was going to call an ambulance first thing in the morning."

iv. *Appellants' emotional state and conduct near the time of Nanette's death*

Neighbor Cassandra Wallis (Cassandra) testified that after 911 had been called, but prior to the arrival of emergency personnel at the scene, Cassandra ran into appellants' residence. Cassandra saw Gregory sitting on a bench approximately five to six feet away from Nanette, drinking a beer. The prosecutor asked Cassandra, "Did it appear to you that he was paying attention to Nanette?" Cassandra responded, "No."

Sergeant Thomas Brewster of the Riverside County Sheriff's Department interviewed Gregory at approximately noon on April 18, three days after Nanette was hospitalized. Gregory told Sergeant Brewster that he had purchased two or three six-packs of beer that morning, and that he had not yet

---

[15] Acetone on the breath is sometimes described as "fruity breath."

visited Nanette at Loma Linda Hospital. Gregory told Sergeant Brewster that he would try to find a friend to take him to the hospital the following day. Sergeant Brewster asked Gregory whether he would be interested in visiting Nanette if Sergeant Brewster were able to arrange the necessary transportation. According to Sergeant Brewster, Gregory responded that, "[h]e was tired, and he needed to get something to eat, and he would have Tony [(the friend)] take him later or the next day." At the end of the interview, Sergeant Brewster explained to Gregory that Nanette was "brain dead," and that the hospital "was keeping her alive on a ventilator as a courtesy so that he would have the opportunity to say his good-byes." Sergeant Brewster stated that Gregory appeared to show "indifference" upon learning of Nanette's condition. Sergeant Brewster then told Gregory that the hospital "would prefer that he go see her sooner rather than later." According to Sergeant Brewster, Gregory responded by reiterating that "[h]e was tired, and he needed to get something to eat, and he would try and have Tony take him later."

Several neighbors testified that on April 15, after paramedics were called, Yvonne went into neighbor Linda Conner's residence and locked herself in the bathroom. Cassandra was attempting to get Yvonne to come out of the bathroom. Neighbor Vickie Hamilton heard Cassandra say, " 'That's no reason not to call 9-1-1 and to lock yourself in the bathroom.' " Yvonne remained in Conner's residence until the ambulance left with Nanette. A few days later, Yvonne told Cassandra that she had not called 911 earlier because she was embarrassed about the smell and mess inside her residence.[16]

Dr. Debra Craig, an ethicist who was involved in making the determination concerning when to remove Nanette from life support, testified that she observed appellants during their final visit with Nanette in the intensive care unit on April 18. Dr. Craig testified that Yvonne did "very little more than glance toward the bed" and estimated that appellants spent "less than three minutes" in the ward during this final visit. Sergeant Gary Leclair of the Riverside County Sheriff's Department interviewed Yvonne on April 18 and testified, "She gave me an opinion [*sic*] that she wasn't interested or didn't care what was going on with her daughter."

> v. *The cumulative impact of the evidence discussed above is sufficient to support the jury's implied finding that appellants acted with implied malice*

Viewing the cumulative impact of the evidence discussed above in the light most favorable to the prosecution, a rational trier of fact could have

---

[16] Holly Benton, an investigator with Child Protective Services, testified that she went to appellants' residence on the night of April 15, 2006. According to Benton, the residence had "no utilities," was "dirty," and "smelled like feces and urine and . . . rotting kinds of smells."

found that appellants were aware that their failure to obtain medical treatment for Nanette endangered her life, and that they failed to obtain medical treatment for her in conscious disregard of that risk. Most importantly, evidence that Nanette displayed clearly visible signs of an extremely serious medical condition supports the inference that appellants were aware of the life-threatening nature of her condition. (See *Burden, supra,* 72 Cal.App.3d at p. 620 [visible evidence of malnutrition "sufficient to show that defendant must have appreciated that his baby was in a state of terminal starvation"]; accord, *People v. Moore* (2010) 187 Cal.App.4th 937, 941 [114 Cal.Rptr.3d 540] [concluding record contained evidence that defendant acted with implied malice and observing, "It takes no leap of logic for the jury to conclude that because anyone would be aware of the risk, [defendant] was aware of the risk."].)

Evidence that appellants had previously received training in recognizing the symptoms of diabetic ketoacidosis bolsters this inference. (See *People v. Brogna* (1988) 202 Cal.App.3d 700, 709 [248 Cal.Rptr. 761] ["evidence that a defendant has suffered a prior conviction and participated, as a condition of probation, in some form of alcohol education program which emphasized the dangers of driving while intoxicated is relevant to prove the accused's awareness of the life threatening risks caused by his conduct"].)

Evidence that several different people told appellants that Nanette needed medical attention in the days prior to her death also supports the inference that appellants were aware of, and consciously disregarded, the risk to Nanette's life of failing to obtain medical treatment. (See *People v. Autry* (1995) 37 Cal.App.4th 351, 359 [43 Cal.Rptr.2d 135] [evidence that passengers warned defendant driver that he was driving dangerously supported inference that defendant acted with implied malice].) Finally, although far from overwhelming, there was some evidence from which the jury could have inferred that appellants were unconcerned with Nanette's fate, even *after* she had suffered cardiac arrest. This evidence also supports the jury's verdict. (See, e.g., *Burden, supra,* 72 Cal.App.3d at p. 620 ["A defendant's lack of concern as to whether the victim lived or died, expressed or implied, has been found to be substantial evidence of an 'abandoned and malignant heart' by the appellate courts of this state."]; *People v. Ogg* (1958) 159 Cal.App.2d 38, 51 [323 P.2d 117] ["Defendant's failure to seek the assistance of his friends or to obtain medical aid even though he knew that his wife was seriously injured indicates a heartless attitude and callous indifference toward her."].)

### b. *Appellants' contentions that the evidence is insufficient to support their convictions are not persuasive*

Appellants contend that *People v. Caffero* (1989) 207 Cal.App.3d 678 [255 Cal.Rptr. 22] (*Caffero*) supports their claim that the evidence in this case was insufficient to support their convictions. In *Caffero*, the Court of Appeal affirmed the trial court's dismissal of murder charges against two parents arising from the death of their two-week-old infant. Evidence suggested that the infant died from a bacterial infection that entered the infant's system through perianal sores. (*Id.* at p. 685.) The sores were likely caused as a result of the infant's skin remaining in "prolonged contact with fecal matter." (*Ibid.*) Although the *Caffero* court noted that there was evidence from which a jury could reasonably infer that the infant's death was caused by the parents' "grossly inadequate care," the court determined that there was "no evidence defendants were actually aware their conduct endangered [the infant's] life." (*Ibid.*) The *Caffero* court thus concluded, "[T]he evidence will not support the inference defendants acted with conscious or wanton disregard for human life and thus with malice aforethought." (*Id.* at p. 686.)

Appellants contend that the present case "is analogous to *Caffero*." We are not persuaded. When the parents in *Caffero* initially took the infant to the emergency room, a triage nurse deemed the infant's condition " 'nonurgent' " after observing that the infant had a temperature of 98.9 and "good facial color." (*Caffero, supra,* 207 Cal.App.3d at p. 681.) In this case, when paramedics arrived at appellants' residence, Nanette was in full cardiac arrest—an obviously life-threatening situation. In addition, in *Caffero*, medical evidence indicated that the infant's "condition became extremely grave a short time after she was brought to the hospital," but that there was "no evidence [that suggested] defendants knew [perianal sores] were life-threatening." (*Id.* at p. 685.) In this case, in contrast, there was evidence that Nanette's condition worsened over several days, that appellants were aware of her worsening condition, and that appellants knew that Nanette's condition was life threatening.

Further, in *Caffero*, two days before taking the infant to the emergency room, the infant's mother called the emergency room and described the infant's symptoms to hospital personnel. (*Caffero, supra,* 207 Cal.App.3d at p. 685.) "[T]he advice she received [in response] conveyed no sense of urgency about the need for immediate medical attention." (*Ibid.*) The following day, the infant's grandmother examined the infant, and told the infant's mother that she thought the infant had " 'colic and diaper rash.' " (*Ibid.*) Thus, in *Caffero*, there was no evidence that the defendants had been warned of the need to seek immediate medical attention for their child. In this case, in contrast, numerous individuals urged appellants to take Nanette to the hospital in the days just prior to her death.

In addition, in this case, in contrast to *Caffero*, there was evidence that appellants had received prior training concerning the medical condition that caused their child's death. Finally, in this case, unlike in *Caffero*, there was evidence from which the jury could have found that appellants were unconcerned with their child's fate after they learned the seriousness of her health condition. In sum, the facts in *Caffero* are clearly distinguishable from those in the present case. *Caffero* thus does not support appellants' contention that there is insufficient evidence to support the jury's verdicts.

Appellants also note that there is evidence that they, and in particular Gregory, took steps to attempt to treat Nanette's physical condition, including providing her with fluids, insulin, and food and monitoring her blood sugar, and that they believed that her condition was improving. Appellants also observe that the records of Nanette's 2001 hospitalization suggest that appellants did not fully grasp the seriousness of Nanette's disease. The record also contains evidence from which the jury might have found that appellants loved Nanette and did not want her to die. Further, Yvonne notes that the record contains evidence that she delegated to Gregory the predominant responsibility to care for Nanette and that, during the relevant time period, Yvonne was "suffering psychologically" as the result of an assault that occurred a few months prior to Nanette's death.

We acknowledge that a reasonable jury *might* very well have determined that the People failed to establish that either appellant acted with implied malice. However, in considering appellants' sufficiency claims, "[w]e do not reweigh or reinterpret the evidence . . . ." (*People v. Baker* (2005) 126 Cal.App.4th 463, 469 [23 Cal.Rptr.3d 871].) The existence of a mere conflict in the evidence provides no basis for reversal. (E.g., *People v. Galvez* (2011) 195 Cal.App.4th 1253, 1259 [126 Cal.Rptr.3d 554] ["All conflicts in the evidence are resolved in favor of the judgment."].) Thus, although we might have reached a different conclusion had we sat as members of the jury, in this appeal the only issue that is properly before us is whether *any* reasonable jury could have found that appellants acted with implied malice. While the evidence is, in our view, far from overwhelming, and we believe that appellants' sufficiency claims present close and difficult issues, we conclude that the evidence described above provides a sufficient basis from which a reasonable jury could have found that appellants acted with implied malice.

### c. *Conclusion*

After reviewing the entire record in the light most favorable to the People, we conclude that there is sufficient evidence to support the jury's implied findings that appellants were aware that their failure to obtain medical treatment for Nanette endangered her life, and that appellants failed to obtain

such medical treatment in conscious disregard of that risk. Accordingly, we conclude that the evidence is sufficient to support the jury's verdicts finding appellants guilty of second degree murder.

B., C.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## IV.

## DISPOSITION

The judgment is affirmed.

Huffman, Acting P. J., and Haller, J., concurred.

Appellants' petition for review by the Supreme Court was denied April 18, 2012, S200372.

---

*See footnote, *ante*, page 319.