Filed 7/31/14  P. v. James CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
|    Plaintiff and Respondent, | G049901 |
|      v. | (Super. Ct. No. RIF1105740) |
| DAVIA DAMANIQUE JAMES and ANDREW PAYNE, | O P I N I O N |
|    Defendants and Appellants. | |

Appeal from a judgment of the Superior Court of Riverside County, /Bernard Schwartz, Judge.  Affirmed as modified.

Christine Vento, under appointment by the Court of Appeal, for Defendant and Appellant Davia Damanique James.

Melissa Hill, under appointment by the Court of Appeal, for Defendant and Appellant Andrew Payne.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Christine Levingston Bergman, Deputy Attorneys General, for Plaintiff and Respondent.

After the death of her two-year-old son, Robert V., Davia Damanique James was convicted by a jury of second degree murder (Pen. Code, § 187, subd. (a); count 2)[1] and felony child endangerment with the infliction of great bodily harm that results in a child's death (§§ 273a, subd. (a), 12022.95; count 3). The trial court sentenced James to an indeterminate term of 15 years to life on count 2, and stayed imposition of sentence on count 3 and the related enhancement.

A separate jury convicted her live-in boyfriend, Andrew Payne, of second degree murder (count 1), illegal possession of Xanax (Health & Saf. Code, § 11350, subd. (a); count 4), forgery of a prescription for Xanax (Bus. & Prof. Code, § 4324, subd. (a); count 5), and child abuse resulting in death (§ 273ab; count 6). The trial court sentenced Payne to an indeterminate term of 25 years to life on count 6, plus a total consecutive determinate term of one year four months on counts 4 and 5. A sentence of 15 years to life was imposed on count 1, but the trial court stayed imposition of sentence pursuant to section 654.

James challenges the sufficiency of the evidence to prove the second degree murder conviction under an implied malice theory, and she claims the prosecution failed to prove she proximately caused Robert's death. She also claims the court abused its discretion by denying her request for probation.

Payne challenges the sufficiency of the evidence to support the prescription forgery conviction, and he claims the trial court violated section 654 by imposing a separate sentence for this crime. He also claims the trial court committed instructional error by limiting the applicability of evidence his was voluntary intoxicated at the time of the crime. Finally, he claims the abstract of judgment does not accurately reflect the trial court's sentence. The Attorney General concedes the final issue, and we correct the

_____

[1] All further statutory references are to the Penal Code unless otherwise noted.

2

abstract of judgment as requested.  For reasons explained below, the judgment is affirmed.

## FACTS

### 1.  911 Call

Around 4:00 a.m. on the morning of November 9, 2011, firefighter paramedics Gabriel Lopez and Gary Roglin responded to a 911 call from a residence shared by Payne, then 22-year-old James, James's two sons, two-year-old Robert and one-year-old Jason V., and Andrea Partridge.

Payne met the paramedics on the front porch of the residence, and he showed Lopez into a bedroom.  Lopez saw Robert on the bed.  His mouth and eyes were partially open, and his tongue was sticking out.  Lopez heard Robert gasp for air, but this could have been an involuntary response known as agonal breathing.

Lopez asked Payne and James what had happened to Robert, but neither responded.  It appeared to Lopez they were apathetic and unconcerned because they were unemotional, unhelpful, and disinterested in Robert's fate.  After some amount of time, Payne said, "I can't talk right now."

Eventually, James told Lopez that Robert had slipped and fallen in the bathroom on the morning of November 7.  She was not at home because she had a doctor's appointment.  James had left Robert in Payne's care.  James also told Lopez that Robert had not been acting normally since the fall.  In fact, he had been asleep for two days, and he had not eaten during that time period.  When Lopez asked James why she had not taken Robert to the doctor, she said she thought he would get better on his own.

Lopez ultimately found a pulse, but because Robert's pupils were fixed, dilated, and unresponsive to light, Lopez knew Robert could have severe brain damage, if not brain death.  Robert was then transported to the hospital.  During the trip, Lopez noticed a scab on Robert's lower lip, a small bump on the bridge of his nose, and a small

3

bump on his forehead, but there was no movement and Robert never regained consciousness.  He died two days later.

Banning Police Officer Brian Callahan observed James at the emergency room.  In the two hours he watched her, Callahan saw James texting or talking on the phone, but she did not appear emotional or concerned for Robert's welfare.  She asked Callahan why he was at the emergency room.  Callahan told her it was to conduct an investigation into the cause of Robert's injuries.  James asked how long that would take, but did not ask about her son's condition.

*2.  Medical Testimony*

On November 10, Dr. Amy Young, a board certified child abuse pediatrician, examined Robert at the hospital.  She noted the following superficial injuries:  (1) curvilinear abrasions consistent with finger scratches and scars on his chest; (2) a contusion and laceration or Robert's lower lip, which was consistent with blunt force trauma to his mouth; (3) curvilinear abrasions consistent with fingernail scratches, or being grabbed with fingernails, on his neck; (4) a faint bruise on the forehead; (5) a red bruising on the edge of Robert's left ear which was consistent with child abuse; (6) bruises on Robert's midback and upper buttocks, and scars on his buttocks; and (7) a circular scar consistent with a cigarette or cigar burn on his right shoulder.

A bone scan disclosed three compression fractures in Robert's thoracic spine, a type of injury consistent with an impact to the top of his head severe enough to compress the vertebra, or by violent back and forth movement.  Young also noticed blood in the area of the fractures.  A CT scan of Robert's abdomen showed swelling and blood in the connective tissue around the intestines, which was consistent with multiple, blunt-force impacts to the abdomen and kidneys.  A CT scan of Robert's brain showed severe global injury, which indicated that Robert's head had been subjected to repetitive acceleration—deceleration impact injuries.  Plus, his brain was swollen with subdural hemorrhaging, which is also consistent with non-accidental trauma.  Young opined

4

Robert's injuries were not accidental. She also testified his injuries were consistent with child abuse. She stated the cause of Robert's death was blunt-force trauma to the head.

According to Dr. Young, Robert's blood acetone level of 66 milligrams per milliliter and his sodium levels indicated he had severed from dehydration. In Robert's preautopsy photographs he looked "wasted," i.e., his ribs were prominent, his stomach sunken, and his extremities thin. Young opined that by the time the paramedics arrived, Robert was dehydrated and malnourished, which when coupled with his other injuries, proved fatal. Young opined the lack of medical care for two full days was a substantial factor in Robert's death. Although she could not state for certain whether early medical intervention would have saved Robert's life, she did say such care would have greatly increased his survival chances.

On November 14, Dr. Cho Lwin, a deputy medical examiner and specialist in neuropathology, conducted Robert's autopsy. Lwin concluded Robert died as the result of multiple blunt-force impacts to the head, which caused swelling, herniation and hypoxic-ischemic encephalopathy, a condition where there is no blood and therefore no oxygen going to the brain.

Lwin testified Robert's brain was swollen and enlarged, and there had been two types of hemorrhages. The first was acute and probably happened within one to six days of his death. The other appeared to be from an injury about a month before death. He also stated that having difficulty breathing would be consistent with the brain stem being pushed down through the spinal column. In all, Lwin saw 10 areas of impact on Robert's skill, and he opined all 10 contusions and the resulting hemorrhages occurred within three days of death. Lwin also testified Robert might have been save if he had been taken to the hospital at the time of his injuries.

*3. Defendants' Pretrial Statements*

Detective Robert Fisher interviewed James and Payne during the morning of November 9. James admitted her pregnancy with Robert was unwanted and Payne had

5

a bad temper, but she denied seeing Payne abusing or hurting Robert. She did not know what happened to Robert, but she said Payne loved the children and would never hurt them, although she admitted Robert did not like Payne. James also said the last time Robert had seen his pediatrician, the doctor told her Robert was healthy, growing normally, and very active.

James explained to Fisher that on Monday, November 7, she left her home around 9:00 a.m. to go to a prenatal doctor's appointment. She left Robert with Payne and Jason with Payne's mother. Before James got to the doctor's office, Payne called to tell her Robert was having a temper tantrum, he would not stop crying, and he might need to see a child psychiatrist.

When James arrived home that afternoon, she found Robert asleep on the floor of his room. James told Fisher she thought Robert was just tired. The next morning, however, Payne, with tears in his eyes, told James that Robert had slipped and fallen in the bathroom and hit his head on the tile floor. Later, Payne claimed he did not know what happened to Robert. James said she was upset by this information, but she did not think Payne was faking memory loss.

James went into the room where Robert was sleeping and checked on him. She noticed a swollen right eye and lip, but his skin felt normal and he did not appear to be having seizures or spasms. However, James could not awaken Robert. She told Fisher that when she tried to give Robert Tylenol and water, he was not able to take the medicine. James said Robert would look at her, but he did make a sound, stand, or respond to light. James said she knew something was wrong with Robert, but she thought he would get better on his own.

According to James, Robert slept all day Tuesday the 8th of November. However, she did not call for medical help, not even after Payne suggested taking Robert to the hospital. James stated she believed Robert just needed to sleep, and doctors would

6

tell her it was nothing. She said Robert had slept for long periods of time before, e.g., 18 hours on one occasion, and been fine afterward.

Around 7:00 p.m. on November 8th, James tried to give Robert a bath, but his body was stiff and he would not sit up. After Robert defecated in the bathtub, James cleaned him up and put him back to bed. Payne again told her to call 911, but Robert seemed responsive to James and so she did not make the call. After 24 hours, James realized Robert was unconscious. Nevertheless, she still would not call 911. She finally called 911 at 3:30 a.m. on November 9 when she realized Robert was having trouble breathing.

Payne told Fisher he was watching Robert while James went to her doctor's appointment. During the afternoon, he saw Robert run into the bathroom and heard him slip and hit his head on the floor. He saw Robert's eyes roll back and his body go stiff, but he decided to just put Robert in his room and let him sleep it off. The next morning, Payne thought they should call 911, but James said it was not necessary. He knew Robert did not eat or move the entirety of November 9, but they waited to call 911 until the following morning.

Payne also told Fisher he had taken Xanax and codeince cough syrup the day of Robert's fall. He also smoked marijuana. At one point, Payne said he could not remember exactly what happened to Robert, but he thought perhaps he had dropped Robert while he carried him into the bathroom. Then, Payne claimed everything he said had been a lie and he had no memory of November 7.

During his incarceration, Payne sent letters to James. In one letter, he asked if there was "anything [he] could do for [James] to forgive [him]." In another letter, Payne admitted ruining their family and their life together, and he asked for forgiveness "so we can get past this, get married, and have as many children as you can pump out." In a third letter, he admitted being "the sole reason for everything that has happened."

7

*4. Defense Evidence*

James's mother testified her grandson was healthy, with a good appetite, but that he was thin. She believed James was a devoted mother, and she trusted Payne with her grandson.

James called two other character witnesses to testify she was a devoted and caring mother who they would never suspect of child abuse and an unemotional person by nature.

*5. Rebuttal*

Partridge, the defendants' roommate, testified she had taken a shower on November 7, but she did not remember leaving water on the bathroom floor. She also testified she had seen Payne drink codeine cough syrup, take Xanax, and smoke marijuana on other occasions, but that he did not appear to be under the influence of any of these substances when she saw him on November 7. In fact, she testified he acted like a "normal, sober-type person" that day.

*6. Prescription Drug Forgery*

On November 9, 2011, Fisher searched the defendants' home. In Payne's bedroom, Fisher discovered 13 empty bottles of cough syrup in a storage space in the closet. He also found a briefcase in the room. The briefcase contained prescriptions for various drugs in the names of several different people. One of the prescriptions was in Payne's name, and it was for oxycodone and a cough syrup made with Codeine. Fisher also found an envelope with the word Xanax written on it, and Payne threw a prescription bottle containing one Xanax at Fisher during the search.

At trial, Dr. Harry Web, a family practice physician with a clinic in Colton, California, testified the prescription form used to write the one prescription found in in Payne's name came from his office. However, neither the writing, nor the signature on the form was his, and he testified he did not recognize Payne and had never written a prescription for him.

**DISCUSSION**

### 1. *James's Claims*

#### *a. Sufficiency of the Evidence*

James claims the evidence is legally insufficient to support the second degree murder conviction on an implied malice theory. She asserts her "failing to seek prompt medical care for her son constituted great neglect but, at the most, was criminal negligence. Thus, the greatest degree of criminal homicide established by the evidence was involuntary manslaughter." We disagree.

"In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] Reversal on this ground is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

The prosecution argued James murdered Robert by either failing to seek medical care when it was clear he needed it, and/or by not giving him food and water between November 7 and 9 of 2011. Murder is an unlawful killing with malice aforethought. (§ 187, subd. (a).) "Second degree murder is defined as the unlawful killing of a human being *with malice aforethought,* but without the additional elements— i.e., willfulness, premeditation, and deliberation—that would support a conviction of first degree murder. [Citations.]" (*People v. Nieto Benitez* (1992) 4 Cal.4th 91, 102.) "Malice, for the purpose of defining murder, may be express or implied. [Citation.] It is express 'when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature.' [Citation.] Implied malice is present 'when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart.' [Citations.]" (*Id.* at pp. 102-103.)

In keeping with the prosecution's theory, the trial court instructed the jury on second degree murder under a theory of implied malice. CALCRIM No. 520 told the jury a conviction required proof beyond a reasonable doubt James intentionally committed an act, the natural and probable consequences of which were dangerous to human life, she knew of the danger when she acted, and she deliberately acted with conscious disregard for human life. If the jury found sufficient proof of these elements, then James was guilty of second degree murder.

The court also instructed the jury with CALCRIM No. 580, the instruction for the lesser offense of involuntary manslaughter. CALCRIM No. 580 states, in pertinent part, "When a person commits an unlawful killing but does not intend to kill and does not act with conscious disregard for human life, then the crime is involuntary manslaughter. [¶] The difference between other homicide offenses and involuntary manslaughter depends on whether the person was aware of the risk to life that his or her actions created and consciously disregarded that risk."

James argues, "The question is whether appellant's failure to provide her child with medical assistance and/or food or water during [the period 11-7-11 through 11-9-11] was aggravated, culpable, gross or reckless neglect incompatible with a proper regard for human life and thus involuntary manslaughter, or involved such a high degree of probability that it would result in death that it constituted conscious disregard for human life, making it second degree murder." We believe the jury properly answered the question.

James admitted she was aware of the injuries to Robert's lip and eye. After she got home, she knew he had not moved or made noise for nearly 24 hours. Many hours later, she noticed his body become stiff when she tried to bathe him. Furthermore, on more than one occasion, Payne suggested she call an ambulance. James refused. Her indifference to Robert's health was apparent to the paramedics who responded, and the police officer who observed her at the emergency room. Thus, a rational jury could

10

reasonably conclude James was aware of the serious nature of Robert's injuries, but she decided to ignore them until it was too late to save his life.

James reliance on two cases, *People v. Burden* (1977) 72 Cal.App.3d 603 (*Burden*) and *People v. Latham* (2012) 203 Cal.App.4th 319 (*Latham*), is misplaced. In *Burden*, the defendant's son was born healthy and normal, but at the age of five months the child died of malnutrition and dehydration. The defendant argued his passive conduct was inadequate to establish malice aforethought. After reviewing several cases, the court concluded an omission can be as malicious as any action. (*Burden*, *supra*, 72 Cal.App.3d at p. 618.)

The court found substantial evidence to support the conviction because the defendant admitted he knew his son was starving to death. As the court stated, "Defendant was obliged to concede that for the last two weeks of the victim's life he could not remember his 'getting anything to eat ever.' The color photographs of the victim's body were themselves sufficient to show that defendant must have appreciated that his baby was in a state of terminal starvation. Add to this defendant's statement that he did nothing about the child's deplorable state, though he could have if he 'had really wanted to,' because he 'just didn't care.'" (*Burden*, *supra*, 72 Cal.App.3d at p. 620.) Under these facts, the appellate court affirmed the jury's verdict of second degree murder. (*Id.* at p. 621.)

In *Latham,* parents of a 17-year-old-girl, Nanette, were convicted of second degree murder after the girl died of diabetic ketoacidosis. (*Latham*, *supra*, 203 Cal.App.4th at p. 324.) The appellate court looked at four categories of evidence and concluded sufficient evidence supported the jury's second degree murder conviction. The four types of evidence were: (1) the obvious nature of Nanette's physical deterioration in the days before her death, (2) the fact her parents were trained to recognize symptoms of diabetic ketoacidosis, (3) that various neighbors saw Nanette during the relevant time period and told her parents to seek medical help, and (4) the fact

11

that parents' emotional state and conduct near the time of Nanette's death indicated a certain lack of concern for Nanette's well-being. (*Id.* at pp. 328-332.)

The appellate court stated, "Viewing the cumulative impact of the evidence discussed above in the light most favorable to the prosecution, a rational trier of fact could have found that appellants were aware that their failure to obtain medical treatment for Nanette endangered her life, and that they failed to obtain medical treatment for her in conscious disregard of that risk." (*Latham*, *supra*, 203 Cal.App.4th at pp. 331-332.) The court went on to note the most important sign was her physical condition: "[E]vidence that Nanette displayed clearly visible signs of an extremely serious medical condition supports the inference that appellants were aware of the life threatening nature of her condition. [Citations.]" (*Latham*, *supra*, 203 Cal.App.4th at pp. 331-332.)

In an attempt to distinguish her situation, James notes the obvious factual differences between her case and *Burden* or *Latham.* Notwithstanding the varying facts involved, those cases are on point. Here, the evidence supports the jury's conclusion James knew and appreciated the severity of Robert's injuries, but she consciously decided to do nothing to protect him. Even after Payne told her Robert had fallen and hit his head, she did nothing to ensure the fall caused no life-threatening injuries. In fact, James treated Robert's condition as some type of normal childhood illness when it was apparent that was not the case, even to Payne. Moreover, she did nothing to ensure the accuracy of her belief in the face of substantial evidence to the contrary. This is the very definition of second degree implied malice murder.

James also claims the evidence is insufficient to prove proximate causation. She asserts, "This case presents a novel application of causation because it deals with a failure to act; it is much more difficult to assess culpability in such a vacuum." She claims the medical evidence does not support a conclusion her failure to act was a proximate cause of Robert's death. Again, we disagree.

The jury was instructed "An act causes death if the death is the direct, natural, and probable consequence of the act and the death would not have happened without the act. A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence." A reasonable person assessing Robert's condition would have known medical intervention was necessary. Plus, the jury was told there may be more than one cause of death, so long as the act is a substantial factor causing death, and "[a] parent has a legal duty to care for and or furnish necessary care and medical attention."

Here, it is undisputed James had a legal duty to provide reasonable medical care for Robert. Based on the medical testimony, Robert's injuries and behavior would have led a reasonable person to believe medical intervention was necessary. But James ignored the obvious signs of Robert's distress. Under these circumstances, it is objectively reasonable to believe James was aware her inaction created a substantial likelihood of death or serious injury. Of course, she did nothing to abate this risk. Thus, the jury reasonably concluded James's failure to perform her duty as a parent to obtain medical care for a sick or injured child was a substantial factor in Robert's death. Thus, substantial evidence supports the verdict

### b. Trial Court's Sentencing Discretion

James requested the trial court grant probation, a request the trial court denied. James claims the trial court abused its discretion by doing so. Again, we find her contention meritless.

A trial court has broad discretion to grant or deny probation, unless there is a statutory limitation. (*People v. Marquez* (1983) 143 Cal.App.3d 797, 803.) The granting of probation is not a matter of right, but a discretionary choice. (See *People v. Main* (1984) 152 Cal.App.3d 686, 693.) The trial court must state the factors which

13

support the denial of probation and the sentencing of a defendant to state prison. (*People v. Romero* (1985) 167 Cal.App.3d 1148, 1151.)

On review, "The grant or denial of probation is within the trial court's discretion and the defendant bears a heavy burden when attempting to show an abuse of that discretion." (*People v. Aubrey* (1998) 65 Cal.App.4th 279, 282.) "'[I]t is not our function to substitute our judgment for that of the trial court. Our function is to determine whether the trial court's order granting [or denying] probation is arbitrary or capricious or exceeds the bounds of reason considering all the facts and circumstances.'" (*People v. Weaver* (2007) 149 Cal.App.4th 1301, 1311.)

California Rules of Court, rule 4.414, lists criteria to be considered in granting or denying probation. (All subsequent references to rules are to the Cal. Rules of Court.) Here, the trial court cited the following factors as reasons to deny probation: (1) rule 4.414(a)(1) (nature and circumstances of crime); (2) rule 4.414(a)(3) (vulnerability of the victim); (3) rule 4.414(a)(4) (infliction of injury); (4) rule 4.414(a)(6) (active or passive participant); (5) rule 4.414(a)(9) (position of trust); and (6) rule 4.414(b)(8) (danger to others if not imprisoned).

On appeal, James argues the trial court relied on improper factors and inaccurate or mistaken information, and the court failed to consider positive factors, like her youth, lack of prior record, and the unusual circumstances of the case, when denying her request for probation. We are not persuaded.

At the beginning of the sentencing hearing, the trial court stated it had read and considered the probation officer's report. The probation report recommended the court deny probation and sentence James to prison. In support of a grant of probation, the report noted James was youthful and had no significant prior criminal record. The report also listed the fact the crime was committed without a weapon (rule 4.414(a)(2)) and evidenced no particular criminal sophistication (rule 4.414(a)(8)), as well as James's willingness to comply with the conditions of probation (rule 4.414(b)(3), (4)) and the

14

likely serious effects of prison on her (rule 4.414(b)(5)) as factors in support of probation. On the other hand, the report also listed nine factors supporting a denial of probation, which included the factors noted by the court in denying James's request and discussed by James on appeal.

The problem with James's argument is her steadfast refusal to view the evidence in any but the light most favorable to her position. She asserts her crime was not serious when compared to other crimes, she did not personally inflict Robert's injuries, nor was she an active participant in the crime. She also claims the court erroneously believed she took advantage of a position of trust, and that she would be a danger to others if not imprisoned. However, these factors need only be established by a preponderance of the evidence (*People v. Leung* (1992) 5 Cal.App.4th 482, 506), and the evidence supports the trial court's assessment.

Furthermore, as the Attorney General points out, a single factor in aggravation provides a sufficient basis for the trial court's sentencing decision. (*People v. Brown* (2000) 83 Cal.App.4th 1037, 1043.) James does not even mention the vulnerability of the victim, which was conclusively proven. Based on the facts of this case, we would not find an abuse of discretion had the court relied on this factor alone in denying probation. In short, we reject James's assignment of error in the trial court's denial of her request for probation, and we conclude the trial court's decision did not violate James's right to due process of law.

15

## 2. *Payne's Claims*

### a. *Sufficiency of the Evidence*

Payne challenges the sufficiency of the evidence to prove he forged a Xanax prescription.[2]  The standard of review applicable to challenges to the sufficiency of the evidence has been previously stated:  "In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.]  Reversal on this ground is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin*, *supra*, 18 Cal.4th at p. 331.)  Substantial evidence supports the jury's verdict.

Business and Professions Code section 4324, subdivision (a) provides, "Every person who signs the name of another, or of a fictitious person, or falsely makes, alters, forges, utters, publishes, passes, or attempts to pass, as genuine, any prescription for any drugs is guilty of forgery and upon conviction thereof shall be punished by imprisonment pursuant to subdivision (h) of Section 1170 of the Penal Code, or by imprisonment in a county jail for not more than one year."[3]

Payne asserts the unexplained possession of prescription forms is not sufficient to prove forgery of a prescription.  He relies on *People v. Davis* (1967) 66

---

[2]  Noting that his trial counsel conceded guilt "'on those two drug charges,'" Payne asserts that if his trial attorney's concession forestalls his challenge to the sufficiency of the evidence on appeal then he also received ineffective assistance of counsel.  We need not discuss this issue in light of our resolution of the merits.

[3]  The court instructed the jury as follows:  "The defendant is charged in Count 5 with forging or altering a prescription drug.  [¶] To prove that the defendant is guilty of this crime, the People must prove that:  [¶] 1.  The defendant forged or altered a prescription; [¶]  AND  [¶] 2.  The prescription was for a prescription drug."

16

Cal.2d 175 (*Davis*) and *People v. McNamara* (1951) 103 Cal.App.2d 729 (*McNamara*), but we find these cases inapposite.

In *Davis,* the defendant was a passenger in a car stopped by police for a traffic violation. (*People v. Davis*, *supra*, 66 Cal.2d at p. 178.) When neither the defendant nor the driver of the car could produce identification, they were arrested and searched. (*Ibid.*) The police found seconal and a marijuana cigarette in the car. An investigation revealed the seconal had been purchased at a pharmacy in another town, using a forged prescription. (*Ibid.*) Both the driver of the car and the defendant made incriminating statements after their arrests, which were introduced at trial. (*Ibid.*) The California Supreme Court reversed the judgments after concluding the statements of the driver and the defendant were erroneously admitted into evidence, and without the defendants' statements the evidence was insufficient to sustain the convictions. (*Id.* at p. 182.) Other than the highlighting the importance of defendants' statements, this case provides no insight as to the nature or quantum of other evidence required to sustain a conviction for violating Business and Professions Code section 4324.

In *McNamara*, the defendant was convicted of conspiracy to commit check forgery. (*McNamara*, *supra*, 103 Cal.App.2d at p. 731.) The defendant challenged the judgment by claiming the jury rendered an inconsistent verdict and thus an implied acquittal. (*Id.* at p. 732.) The prosecution's case against the defendant included the testimony of his coconspirators. (*Id.* at p. 733.) Payne argues the coconspirators' testimony provided the kind of corroborating evidence necessary to more than establish mere "shared constructive possession of the instrument. . . ." We do not necessarily agree with that assessment of the case, but assuming we did, it provides no guidance for this case.

Thus, it is unclear why Payne believes *Davis* and *McNamra* bolster his argument. As noted, neither is on point. But regardless, the evidence adduced at trial demonstrates Payne unlawfully possessed prescription forms from a doctor who had

never treated him. Payne's briefcase, which contained multiple prescriptions, also held an envelope with the word "Xanax" written on it, as if someone was practicing how to write the word, and Payne had a Xanax tablet on his person. During one of his interviews, Payne admitted he had taken Xanax for years although he had never been prescribed the drug. We agree there is no direct evidence Payne altered a particular prescription form to obtain Xanax, but the circumstantial evidence leads to a reasonable inference Payne forged a prescription in violation of Business and Professions Code section 4324. Thus, the evidence is sufficient to sustain the conviction.

Payne also argues the trial court violated section 654 by imposing sentence on the forgery and possession counts. As relevant, section 654, subdivision (a), provides: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." Thus, the question is whether Payne's "'course of conduct . . . comprised a divisible transaction which could be punished under more than one statute within the meaning of section 654.'" (*Neal v. State of California* (1960) 55 Cal.2d 11, 19, disapproved on other grounds in *People v. Correa* (2012) 54 Cal.4th 331, 334.)

The critical inquiry is "[w]hether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (*Neal v. State of California*, *supra*, 55 Cal.2d at p. 19, disapproved on other grounds in *People v. Correa, supra,* 54 Cal.4th at p. 334.) Payne claims he committed both crimes with the single objective of maintaining his addiction. While the abuse of prescription medications could be considered his single objective, it is clear Payne harbored an intent to obtain prescription medicine and a separate intent to possess it. Consequently, the trial court appropriately imposed separate punishment for both crimes.

18

### b. Instructional Error

While going over proposed jury instructions with counsel, the court stated, "Now, next is [CALCRIM No.] 580[4]. We had a rather lengthy discussion off the record as it related to involuntary manslaughter. The People's theory, with respect to Mr. Payne, is, in essence, first, that the defendant committed the crime of first-degree murder with premeditation and deliberation. They will be read voluntary intoxication, which we haven't gotten to yet, but we'll deal with that now, 625 of CALCRIM.[5] The court is going to give that but instruct the jury that it is only applicable as to reduce the first-degree to a second-degree murder. It would not be applicable to do anything else. So the Court will modify that instruction indicating that voluntary intoxication would only apply as to negate the premeditation and deliberation, and reduce the charge from first-degree to second-degree murder. [¶] . . . [¶] I am not going to instruct the jury as to how they are to consider both involuntary manslaughter and voluntary intoxication.. . . . " Payne did not object.

---

4 With respect to CALCRIM No. 580, the trial court instructed the jury, in pertinent part, as follows: "When a person commits an unlawful killing but does not intend to kill, and does not act with conscious disregard for human life, the crime is then involuntary manslaughter. The difference between other homicide offenses and involuntary manslaughter depends on whether the person was aware of the risk to life that his or her actions created, and consciously disregarded that risk. An unlawful killing . . . caused by a willful act done with full knowledge and awareness that the person is endangering the life of another, and done in conscious disregard of that risk, is involuntary [*sic*] manslaughter or murder. An unlawful killing resulting from a willful act committed without intent to kill, and without conscious disregard of the risk to human life is involuntary manslaughter."

5 CALCLRIM No. 625 as given stated, "A person is voluntarily intoxicated if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance, knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect. [¶] You may not consider evidence of voluntary intoxication for any other purpose. You may not consider this evidence as it relates to Counts, 4, 5, and 6. You may not consider this evidence of voluntary intoxication to reduce a murder charge to involuntary manslaughter."

19

Payne claims the trial court committed prejudicial error by limiting the jury's consideration of evidence of voluntary intoxication to the difference between first and second degree murder, because voluntary intoxication can also be used to reduce murder to involuntary manslaughter. We disagree.

In *People v. Turk* (2008) 164 Cal.App.4th 1361 (*Turk*), the defendant claimed instructional error because the trial court failed to instruct the jury on involuntary manslaughter based on voluntary intoxication in a prosecution for first degree murder. After a lengthy discussion on the trial court's duty to instruct a jury on involuntary manslaughter stemming from voluntary intoxication in the wake of the abolition of the diminished capacity defense and amendments to former section 22 (*id.* at pp. 1371-1379), the *Turk* court concluded, "It is no longer proper to instruct a jury, as Turk suggests, that 'when a defendant, as a result of voluntary intoxication, kills another human being without premeditation and deliberation and/or without intent to kill (i.e. without express malice), the resultant crime is involuntary manslaughter.' This instruction is incorrect because a defendant who unlawfully kills without express malice due to voluntary intoxication can still act with implied malice, which voluntary intoxication cannot negate,

in the wake of the 1995 amendment to section 22, subdivision (b)." (*Id.* at pp. 1376-1377, fn. omitted.)[6]

In fact, the *Turk* court explained that the Legislature's 1995 amendment made evidence of "voluntary intoxication inadmissible to negate implied malice in cases in which a defendant is charged with murder." (*Turk, supra,* at pp. 1374-1375, citing *People v. Timms* (2007) 151 Cal.App.4th 1292, 1298, review den. Sept. 19, 2007; *People v. Martin* (2000) 78 Cal.App.4th 1107, 1114-1115; *People v. Reyes* (1997) 52 Cal.App.4th 975, 984, fn. 6.)

*Turk* has not been overruled, and we agree with its reasoning and conclusion. However, were we to assume for purposes of this discussion that the trial court should have instructed the jury that Payne's voluntary intoxication may negate express *and* implied malice, the error was harmless.

The problem is that even viewed in the light most favorable to Payne (*People v. Stewart* (2000) 77 Cal.App.4th 785, 795-796), the evidence his voluntary intoxication rendered him unable to form express or implied malice was weak at best.

---

6  Former section 22, subdivision (b), provided: "Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought." The 1995 amendment added "express" before "malice aforethought." (Stats. 1995, ch. 793, § 1.)

In 2012, section 22 was renumbered to section 29.4 and amended. (Stats. 2012, ch. 162, § 119.) Section 29.4 states: "(a) No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his or her having been in that condition. Evidence of voluntary intoxication shall not be admitted to negate the capacity to form any mental states for the crimes charged, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act. [¶] (b) Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought. [¶] (c) Voluntary intoxication includes the voluntary ingestion, injection, or taking by any other means of any intoxicating liquor, drug, or other substance."

True, Payne claimed he ingested Xanax, coedine, and marijuana at the time Robert's injuries likely occurred and he once told James he could not remember what happened, none of the witnesses observed objective symptoms of intoxication.

Payne gave James a clear explanation of Robert's injuries at the time the injuries occurred, and James did not testify Payne seemed intoxicated when he called her. Nor did she say he appeared to be in any kind of state remotely approaching unconscious when she returned from her doctor's appointment.

Moreover, neither the responding paramedic, nor Fisher, nor Partridge testified Payne exhibited signs of intoxication. In fact Partridge, the woman who lived with Payne and James and had seen Payne on a combination of drugs in the past, testified Payne appeared to be "normal, a sober-type person" on the day James left Robert in Payne's care to attend a doctor's appointment. Under the facts presented in this case, which is one of the more egregious cases of child abuse and neglect we have seen, the error would be harmless beyond a reasonable doubt. (*People v. Larsen* (2012) 205 Cal.App.4th 810, 829 [instructional error is generally subject to "'the *Chapman*[*v. California* (1967) 386 U.S. 18, 24] "beyond a reasonable doubt" standard for assessing prejudice'"].)

And, finally, an error that is harmless beyond a reasonable doubt precludes a finding of prejudice assuming Payne's attorney performed below an objectively reasonable standard. (*People v. Stanley* (2006) 39 Cal.4th 913, 954, [reversal on ineffective assistance grounds proper only where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been more favorable to the defendant. [Citation.]".) Thus, Payne's claim of instructional error is meritless.

### c. Abstract of Judgment

The trial court sentenced Payne to an indeterminate term of 25 years to life on count 6, plus a total consecutive determinate term of one year and four months on

counts 4 and 5.  The abstract of judgment incorrectly reflects the imposition of a total determinate term of 26 years and four months.  Payne contends the abstract must be corrected to accurately reflect the trial court's imposition of sentence, and the Attorney General concedes the error.  We agree.

## DISPOSITION

The judgment is affirmed as modified.  The clerk of the superior court is directed to correct Payne's abstract of judgment to reflect the imposition an indeterminate term of 25 years to life on count 6, plus a total consecutive determinate term of one year and four months on counts 4 and 5; and to forward a copy of the corrected abstract to the Department of Corrections and Rehabilitation.


THOMPSON, J.

WE CONCUR:


MOORE, ACTING P. J.


ARONSON, J.


23