Filed 3/30/23  P. v. Collins CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>BRITTNEY COLLINS,<br><br>    Defendant and Appellant. | B322744<br><br>(Kern County<br>Super. Ct. No.<br>MF013183B) |

APPEAL from a judgment of the Superior Court of Kern County, Charles R. Brehmer, Judge.  Affirmed.

John Steinberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Senior Assistant Attorney General, Louis M. Vasquez, Supervising Deputy Attorney General, and Amanda D. Carey, Jennifer Oleksa, and Ian Whitney, Deputy Attorney Generals, for Plaintiff and Respondent.

Defendant and appellant Brittney Collins's (defendant's) two-month-old son, Abel Norwood (Abel), died of blunt force head trauma. A jury convicted defendant of second degree murder for failing to protect her son from his father Matthew Norwood (Norwood), a methamphetamine addict who inflicted the fatal injuries on the infant. The trial court sentenced defendant to 15 years to life in state prison. Defendant asks us to decide: (1) whether her trial attorney was constitutionally ineffective because he did not present a defense of intimate partner battering (IPB),[1] (2) whether the trial court had a sua sponte duty to instruct the jury on the lesser included offense of voluntary manslaughter, (3) whether there is sufficient evidence defendant failed to act with the intent to facilitate Abel's killing, and (4) whether the court erred by imposing various fines and assessments without first determining defendant's ability to pay.

## I. BACKGROUND

### A. *Abel's Hospitalization and Death*

On October 17, 2018, defendant was at home in Tehachapi, California, with Abel and her 78-year-old grandmother Shirley Collins (Shirley). Earlier that morning, defendant and Norwood had argued over his drug use: she told him to move out, and he

---

[1] "Although often referred to as 'battered women's syndrome,' 'intimate partner battering and its effects' is the more accurate and now preferred term. (See, e.g., Stats. 2004, ch. 609, §§ 1, 2 [changing references in Evid. Code, § 1107 and Pen. Code, § 1473.5 from 'battered women's syndrome' to 'intimate partner battering and its effects']; see also *People v. Humphrey* (1996) 13 Cal.4th 1073, 1083-1084, fn. 3 [(*Humphrey*)].)" (*In re Walker* (2007) 147 Cal.App.4th 533, 536, fn. 1 (*Walker*).)

broke her cellular phone. During most of that day, Norwood had been Abel's primary caregiver because Collins was not feeling well; she was still suffering from the effects of her caesarian section weeks earlier and was at the time suffering from an infection and the side effects of an antibiotic.

Norwood left the family home that day between 3:30 and 4:00 p.m. to go to Home Depot. According to Norwood, Abel was "fine" when he left the house. At approximately 5:00 p.m., defendant went to check on Abel. Moments later, she began screaming "Something's wrong with my baby." She brought Abel to Shirley, who saw that her grandson was "not in good shape" because he "twitch[ed]" and only the whites of his eyes were visible.

Defendant assumed Abel was having a seizure. As Shirley held Abel, defendant rushed outside and called for help from two neighbors. The neighbors found Abel to be "burning up" and "lifeless" with his eyes rolling up into the back of his head. The neighbors, one of whom called 911, tried to lower Abel's temperature by putting cool water on him. Paramedics were called.

The responding emergency personnel found Abel pale, lethargic, and unresponsive to stimulus. After concluding Abel "needed help immediately," the paramedics rushed him to Kern Medical Center in Bakersfield, California. During the drive to the hospital, Abel exhibited "seizure-like activity" and remained unconscious.

At the medical center, one of the emergency room nurses observed bruising and swelling below Abel's left knee indicative of a possible bone fracture. The nurse ordered an x-ray of Abel's leg in addition to a computerized tomography (CT) scan of his

head.  The x-ray of Abel's left leg showed a recent fracture of the left tibia; the fracture was also angulated, i.e., the tibia was not merely broken but also bent out of its normal orientation.  The CT scan revealed multiple bilateral parietal skull fractures and small scalp hematomas; the head injuries were so "profound" that in the radiologist's opinion Abel's brain was at the time either "already dead or in the process of dying."

After consulting with the radiologist, the emergency room nurse contacted Kern County's child protective services agency.  Later that night, because the medical center did not have a pediatric intensive care unit, Abel was airlifted by helicopter to Valley Children's Hospital (Valley Children's) in Madera, California.

The following day, a pediatric radiologist at Valley Children's reviewed various diagnostic imaging studies of Abel.  The CT scan of the pelvis and abdomen and a bone survey showed multiple rib fractures, some of which were quite recent, while others were older.  The x-rays of Abel's head showed displaced skull fractures, an occurrence which is uncommon in infants as it requires major trauma, such as a high-speed automobile accident.  In each of Abel's four extremities, the radiologist found evidence of metaphyseal corner fractures, "a very uncommon fracture type," one which is "only seen in child abuse."[2]  In the radiologist's opinion, the imaging studies taken

---

[2]     In addition, a pediatric ophthalmologist at Valley Children's examined Abel's eyes.  Using RetCam, a high resolution digital imaging system, the ophthalmologist found retinal hemorrhages "too many to count" where "there should not be any."  The number of hemorrhages were, in the view of the ophthalmologist, indicative of trauma.

4

together were diagnostic of "severe" or "pure" child abuse, "unless the child had been in a car accident at 75 miles per hour [and] ejected" from the vehicle. Due to the different ages of his injuries, Abel would have had to suffer multiple incidents of trauma to account for all the injuries.

A week after being hospitalized, Abel died. An autopsy was subsequently performed by a forensic pathologist.

The autopsy revealed that almost all of the rib fractures displayed callus formations, which meant the injuries occurred seven to 10 days before Abel was hospitalized and were the result of "extreme" or "severe" chest compressions: "the child's chest and torso [we]re grasped between . . . two hands and then the infant's body [was] markedly[,] violently shaken . . . ." In contrast to the rib fractures, the leg fracture was "fresh," with no signs of healing. The autopsy also revealed that, in addition to retinal hemorrhages, Abel suffered retinal detachments, a finding which came as a "surprise" to the pathologist because such injuries are usually found only in infants who suffered violent head trauma as a result of traffic accidents.

In the pathologist's opinion, the cause of Abel's death was "blunt head injuries" and "the manner of death was homicide." The pathologist opined Abel's head and leg injuries occurred at the same time; "the leg was used as a handle to pick the infant up and then sw[u]ng . . . into a wall or down into the ground . . . causing death." The pathologist concluded there was no possibility of recovery from such a head injury; Abel was "dying from the time of the injury."

*B.     Defendant's Pre-Trial Statements to Law Enforcement*

Because there was no room for them in the helicopter that transported Abel from Kern Medical Center to Valley Children's, defendant, Norwood, and Shirley drove to Madera. After they arrived at Valley Children's, a Madera County Sheriff's deputy, acting in response to a request from the Kern County Sherriff's Office for assistance in a possible child abuse investigation, questioned Abel's parents.

Norwood told the Sheriff's deputy that before he left the family home, he changed Abel's diaper and attempted to feed him; Abel was, as usual, "fussy" during the changing but went back to sleep before Norwood could feed him. Defendant explained that sometime after Norwood left the home, she heard Abel make a noise and when she went to check on him, she found him pale in color and warm to the touch. Both parents denied Abel had been struck or dropped. Both parents also stated Shirley would occasionally watch Abel for short periods, anywhere from 30 minutes to two hours, but, as defendant explained, Shirley would not carry the baby due to her limited mobility (she used a walker to move from place to place).

When defendant and Norwood arrived back in Tehachapi on October 18, they found deputies from the Kern County Sheriff's Office conducting a search of the family home. In one of the bathrooms, deputies found a hypodermic needle with a "blackish substance" inside of it. In the bedroom used by defendant and Norwood, deputies found an open suitcase laying on the bed half-filled with what may have been men's clothes.

Following the search, defendant and Norwood agreed to be interviewed at the Sheriff's Tehachapi substation. While waiting for the interviews to begin, defendant and Norwood remained in

the backseat of a patrol car.  The car was equipped with an audio recording device and their conversation was recorded.  As soon as they were left alone in the patrol car, Norwood told defendant, "Don't be tryin' to add anything extra to your story, okay"?  During their conversation, which they recognized could be subject to recording, Norwood repeatedly affirmed to defendant that he loved her and repeatedly stated he would not incriminate defendant or anyone else.  Defendant replied, "Babe, I'm not going to throw you under the bus."  Defendant and Norwood also repeatedly made statements suggesting Shirley may have been responsible for Abel's injuries.  Defendant also told Norwood she saw the law enforcement officers recover the aforementioned hypodermic needle.

The detectives interviewed defendant and Norwood separately.  At several points during her interview, defendant made inconsistent statements.

For example, defendant initially claimed the hypodermic needle found by law enforcement at the family home was hers, which she used for insulin injections.  Later, she claimed she used the needle for methamphetamine.  Eventually, she admitted the needle was not hers but Norwood's.  Defendant told the detectives Norwood asked her to claim the needle as hers.

In another instance, defendant first stated Norwood did not use any drugs only to later reveal Norwood used methamphetamine on a "daily basis," which was "more than he should" because it made him paranoid.  Defendant also initially stated she thought Shirley had dropped Abel accidently, got scared, and lied to cover up the accident.  But after further questioning, defendant admitted Norwood had told her to blame Shirley for Abel's injuries.

7

When asked whether Norwood was the one who injured Abel, defendant conceded that was the "first thing" that had gone through her mind because Norwood was the last one with Abel. She said Norwood might have had a "lapse in judgment" as a result of his drug use and knocked the bassinet over "on accident or something." Defendant claimed, however, that she had never seen Norwood hit Abel.

The following day, October 19, detectives interviewed defendant again, this time after arresting and Mirandizing her. After initially denying she ever saw Norwood abuse Abel, defendant admitted she had seen Norwood mistreat their son in different ways before the events on October 17 when he was rushed to the hospital. Among other things, defendant said Norwood would roll Abel over by his leg "all the time" and had bumped Abel's head "on stuff" on more than one occasion. Although Norwood claimed the bumps were accidental, defendant did concede "you don't – don't – don't accidentally bump your baby's head." In addition, defendant admitted she saw Norwood push down hard on Abel as he lay on a bed and squeeze him hard enough to break a rib while shaking his head. When Abel cried, Norwood would get mad and bounce Abel "too hard" and cover the infant's mouth with his hand "a lot." Defendant told the detectives Norwood had "rage" inside of him "[be]cause he's a drug addict." In her view, Norwood abused their child because he was "just too high to deal with [Abel]."

When questioned specifically about the events on the day Abel was transported to the hospital, defendant explained Norwood cared for Abel most of the day while she napped on the couch and periodically checked on Abel, who appeared to be breathing normally. At approximately 3:30 p.m., she heard Abel

make a noise from the room where he was sleeping. In a "pretty insistent" manner, Norwood refused defendant's offer to feed Abel and left the room to tend to Abel himself. At the time, defendant thought Norwood's behavior was "kinda weird" because she was "always" the one who fed Abel and changed his diaper. From the room where Norwood was tending to Abel, defendant heard the sound of a loud bang. The sound was similar to what she had heard on at least five other occasions when Norwood was caring for Abel by himself in another room. On those prior occasions, Abel had always made an "exclamation" noise or cried louder in response, but on that day he made no sound following the "big bang." Previously, Norwood would explain away the banging noises by saying he bumped into the bassinet by accident—an explanation defendant did not credit, because when she tried to recreate the noise by bumping the bassinet herself the sound she made was "nowhere near . . . as loud" as the sound she heard. When Norwood reappeared from the nursery, he told defendant Abel did not want a bottle and had gone back to sleep. To defendant, Norwood appeared "real antsy," which she attributed to him being "high." Norwood then left the house quickly but, instead of sitting in his car for a minute or two as was his usual custom, he drove away from the house immediately. An hour later, when defendant went to check on Abel, she found him pale and foaming at the mouth, which led her to immediately scream for help. Later, when she was first interviewed by police at Valley's Children and was told someone had hurt her son, defendant's first thought was that Norwood was responsible.

During the course of her custodial interview, defendant also claimed Norwood had acted violently toward her. On a number of occasions, she said, Norwood would vent his frustration by yelling

9

and raising his fist at defendant and also punching her in the arm hard enough to leave a bruise. In addition, Norwood pushed her down and pinned her to the bed "quite a bit," kneed her in the stomach once while she was pregnant, choked her a "couple of times," and kicked her in the face once during an argument over his drug use (which required her to get a fake tooth). Defendant said that when she was eight months pregnant, Norwood pushed her down, "got in [her] face, and threatened to make her lose the baby." In defendant's opinion, "it was the drugs" that made Norwood abuse her. Defendant explained that prior to Abel's hospitalization, including while she was pregnant, she was afraid to call the police on Norwood because he might retaliate by hurting her, or even killing her. She added that after they were interviewed by police on October 18 and returned home, she was scared of Norwood because she had told the truth to the detectives. In retrospect, defendant acknowledged she should have told Norwood to leave the family home earlier or called the police the first time she saw him cover Abel's mouth or the first time he hit her when she was pregnant.

### C. Criminal Charges and Additional Statements by Defendant

On October 23, 2018, while Abel was still being cared for at Valley Children's, defendant and Norwood were charged by felony complaint with causing their son's injuries. On that same day, defendant was again interviewed by the police. At that time, she told the police she felt like she failed to protect Abel because if she would have "told [Norwood] to leave sooner or called the police sooner, Abel wouldn't be hurt. . . . And I regret ever meeting [Norwood] and getting with him."

After Abel died, defendant and Norwood were charged by information with second degree murder (Penal Code,[3] § 187, subd. (a)) (count one) and assault on a child under eight years old by means of force reasonably likely to produce great bodily injury, which results in the child's death (§ 273ab, subd. (a)) (count two).[4] The charges against each defendant were tried to separate juries.

D. *Defendant and Norwood's Testimony at Defendant's Trial*

During defendant's direct examination testimony, she acknowledged she knew Norwood was a drug addict but she maintained she had no idea Norwood would harm Abel. According to defendant, Norwood "always" took "pretty good" care of her son whenever she was watching and she never thought Norwood would harm her son behind her back.

Defendant testified neither she nor the nurse practioner who examined Abel at his well-baby visits ever observed any bruising on Abel prior to October 17. She stated she "never" saw Norwood abusing Abel and, if she had, she "definitely" would have called the police. Defendant claimed she only told the police

---

[3] All undesignated statutory references that follow are to the Penal Code.

[4] While awaiting trial in a Kern County pre-trial detention facility, defendant was taken from her cell to the infirmary because she was crying hysterically and had cut her wrist with a razor. According to the detention officer who escorted her to the infirmary, defendant said her "husband killed my son and my cellmate keeps talking about people killing their babies. I couldn't take it being in there anymore."

Norwood abused Abel because she thought that was what they wanted to hear and if she told them that she would be released. Although defendant and Norwood had arguments, she denied he ever hurt her physically and she said she "[m]ore than likely" would have called the police if he had.

On cross-examination, defendant admitted she knew Norwood used drugs on the day of Abel's fatal injury and on the days prior, and she explained Norwood would sometimes become "weird," "antsy," "mean," and "angry" when using. Defendant admitted she lied to the police about who owned the hypodermic needle and when suggesting Shirley may have dropped Abel; she said she lied at Norwood's request and was afraid of him.

When asked who killed her son, defendant acknowledged it had to be Norwood because she did not do it and he was the last one with Abel. Defendant also conceded she "stood up for [Norwood] at every turn" and Abel would still be alive if she had called the police sooner. Although defendant recognized Norwood could be violent and admitted she lied to the detectives about Norwood abusing Abel prior to October 17, defendant persisted in the view that she "never saw [Norwood] actually do anything" to Abel. Defendant specifically denied what she admitted in her interviews with law enforcement: seeing Norwood push or shake Abel, bump his head into objects, or cover his mouth to get him to stop crying.[5] As for the loud noises she heard when Norwood and Abel were alone in another room, defendant testified she lied

---

[5]  Defendant said she made these incriminating interview statements because she wanted to be with Abel and told the detectives what she thought they wanted to hear.

12

when she told detectives the noises could not have been made by Norwood accidentally bumping into the bassinet.

Defendant, while testifying, also minimized the events she had previously described for the police about her relationship with Norwood. For example, she described him kneeing her in the stomach as just "one of the little things he did." Instead of choking her more than once while pregnant, as she told the detectives, defendant testified it was only once. And when Norwood kicked her in the face, she testified it was an accident because she startled him while he was asleep. Although she testified on direct Norwood never hurt her, she did admit on cross-examination that she was afraid to return home with Norwood after their police interviews on October 18 and did so only because she had nowhere else to go. On re-direct, defendant's attorney did not ask her about any of the abuse she purportedly suffered at Norwood's hands; instead, he confined his questions to whether she used any drugs during her pregnancy, which she testified she had not.

Norwood also testified at defendant's trial. He acknowledged he struggled with controlling his anger and admitted that at the time of Abel's fatal injury he was on probation for misdemeanor domestic violence and enrolled in a court-ordered domestic violence program. Norwood also admitted he was addicted to methamphetamine. Norwood conceded methamphetamine made him irritable, which made it more difficult to control his anger, and acknowledged that his son's "grumpiness" irritated him. Norwood claimed, however, he was "never angry with his son no matter what."

According to Norwood, Abel was "more fussy than normal" and "screaming" on October 17, but Norwood was not irritated

13

because he recognized his son had cause to be fussy having received immunization shots the day before. Later in his testimony, however, Norwood admitted he was caring for Abel that day and was irritated because he found his infant son to be "fussy and grumpy."

Norwood continued to assert it was possible Shirley inflicted some of Abel's injuries, but he conceded other injuries, such as the broken left leg and the retinal detachments, could only have been inflicted by himself or defendant. Norwood denied ever physically abusing defendant, denied killing Abel, and specifically denied picking his son up and slamming his head into the ground or a wall, or swinging him by his leg into the ground.

When defendant's attorney cross-examined Norwood, he did not ask about Norwood's physical abuse of his client. Instead, trial counsel pursued three different topics: defendant's diligence in attending every prenatal doctor's appointment and always testing negative for drugs at those appointments; Norwood's efforts to prepare for the birth of his son by, among other things, attending parenting and anger management classes; and the specific events on October 17 when Abel was rushed to the hospital.[6]

---

[6] In addition to defendant and Norwood, the defense also called Shirley as a witness. She testified that although it was not unusual for defendant and Norwood to argue, she did not regard their arguing as abusive, just "two young people trying to know each other and work things out." With regard to Abel, she testified she did not see or hear either parent mistreat Abel (though she admitted she was hard of hearing) and did not observe any injuries to Abel prior to October 17. Although she

14

### E.	Jury Instructions, Closing Argument, Verdict, and Sentencing

In connection with the murder charge, the trial court instructed the jury using CALCRIM Nos. 401 (aiding and abetting), 500 (homicide), and 520 (second degree murder), as well as with the following special instruction: "The word 'act,' as used in these instructions, includes an omission or failure to act in those situations where a person is under a legal duty to act. [¶] A parent has a legal duty to his or her minor child to take every step reasonably necessary under the circumstances in a given situation to exercise reasonable care for the child to protect the child from harm, and to obtain reasonable medical attention for the child." The record indicates the defense did not request instructions on voluntary manslaughter or imperfect self-defense, or object to the absence of such instructions.

During closing argument, the prosecution acknowledged Norwood's abuse of defendant but emphasized defendant's failure to protect Abel in light of her knowledge of Norwood's methamphetamine use and his physical abuse of Abel. As the prosecution put it, Abel died "[b]ecause of what [Norwood] did and because of what [defendant] didn't do."

The defense argued defendant was innocent of both charges (murder and assault on a child resulting in death) because she

---

took out restraining orders against both defendant and Norwood following Abel's hospitalization, she could not remember why—other than to say she was advised to do so by law enforcement.

The defense also called four character witnesses to testify (defendant's college friend, an uncle, an aunt, and a foster mother), all of whom attested to defendant's penchant for honesty.

15

never saw any actual abuse of Abel. According to the defense, defendant could not have prevented Abel's death because Norwood, after being a good father for two months, unexpectedly "went berserk" and "snap[ped]" during a "very stressful day." The defense argued defendant was a responsible mother who "did everything right, made [every prenatal and well-baby] appointment." The defense also urged the jury to give little weight to reports of arguing and domestic violence between defendant and Norwood: "Like a lot of young couples, they say and do mean things, [and] regret it later. That's what I think happened here."

On October 21, 2020, the jury found defendant guilty of second degree murder and not guilty of assault on a child resulting in death as charged in count two—but guilty of the lesser included offense of assault with force likely to cause great bodily injury.[7]

At sentencing, defendant's attorney urged the trial court to be lenient on the following ground: "I don't know if the Court knows but I was the first attorney in California to bring about Batter[ed] Wife Syndrome as a defense. Not that I'm saying that in this case; however, a common thread with young women is they tend to accept some forms of abuse only to try and make the marriage work and only to keep a family together. [¶] That's what I think [defendant] is guilty of, if that. I would ask the Court to consider felony probation." The court declined and sentenced Collins to 15 years to life in prison. The court also imposed various fines and assessments without objection.

---

[7] Norwood's jury found him guilty as charged and the trial court sentenced him to 25 years to life in prison.

16

## II. DISCUSSION

Defendant's three challenges to her convictions are unavailing. There is no basis for reversal on direct appeal for asserted ineffective assistance of counsel because there are easily hypothesized tactical reasons for counsel's decision not to present an IPB defense—most prominently, a strategic decision to pursue an outright acquittal (on the theory defendant was oblivious to Norwood's proclivity for harming Abel) rather than conviction on some lesser offense based on the effects of IPB. An instruction on voluntary manslaughter was not required because the theory defendant advances on appeal is one of duress, not imperfect self-defense (she aided and abetted Norwood in the killing of an innocent third party, her infant son, not Norwood), and the existence of duress (even if proven) is not a defense to murder. And as for the sufficiency of the evidence, there was enough to permit a rational juror to find beyond a reasonable doubt that defendant knew of Norwood's abuse of Abel but intentionally failed to take any reasonable steps to protect the baby—including on the day in question when defendant knew Norwood was high and still angry from their earlier argument.

Defendant's lone sentencing contention, that fines and assessments were improperly imposed under the reasoning of *People v. Dueñas* (2019) 30 Cal.App.5th 1157, is forfeited for lack of an objection in the trial court.

### A. *Ineffective Assistance of Counsel Has Not Been Shown*
#### 1. *Expert evidence on IPB*

For many years, criminal defendants accused of committing violent crimes against their batterers were denied the ability to use expert testimony to assist the trier of fact in understanding

17

the psychological effects of intimate partner battering to negate the malice element of murder.  (*People v. Brown* (2004) 33 Cal.4th 892, 902 (*Brown*).)  To address that problem, the Legislature added section 1107 to the Evidence Code, effective January 1, 1992 (Stats. 1991, ch. 812, § 1, 3612-3613), which authorizes admission of expert testimony regarding intimate partner battering and its effects.  (*Brown*, *supra*, at 902.)  By negating the element of malice, "evidence of intimate partner battering and its psychological effects can reduce an intentional killing from murder to voluntary manslaughter."  (*Walker*, *supra*, 147 Cal.App.4th at 546; accord, *Humphrey*, *supra*, 13 Cal.4th at 1086 [expert testimony on effects of IPB is relevant to support imperfect self-defense, i.e., that defendant genuinely but unreasonably believed she was in imminent danger of serious bodily injury].)  Expert testimony on IPB can also be relevant to a victim's credibility "'by dispelling many of the commonly held misconceptions about battered women'" and "'"the ordinary lay person's perception that a woman in a battering relationship is free to leave at any time . . . .'" [Citation.]"  (*Id*. at 1087.)

> 2.      *Ineffective assistance of counsel on direct appeal*

"'In assessing claims of ineffective assistance of trial counsel, we consider whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and whether the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome.  (*Strickland v. Washington* (1984) 466 U.S. 668, 694[ ]; *People v. Ledesma* (1987) 43 Cal.3d 171, 217 [ ].)'" (*People v. Carter* (2005) 36 Cal.4th 1114, 1189 (*Carter*).)  We presume "'counsel's performance fell within the

18

wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy. Defendant thus bears the burden of establishing constitutionally inadequate assistance of counsel. [Citations.]'" (*Ibid*; see also *People v. Scott* (1997) 15 Cal.4th 1188, 1212 [a reviewing court "should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight"].) "'If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation.' [Citation.]" (*Carter*, *supra*, at 1189; accord, *People v. Mickel* (2016) 2 Cal.5th 181, 198 ["[A] reviewing court will reverse a conviction based on ineffective assistance of counsel on direct appeal only if there is affirmative evidence that counsel had ""no rational tactical purpose"" for an action or omission"].)

> 3. *There is no basis in the record to conclude trial counsel's performance was objectively unreasonable*

The appellate record does not reveal why defendant's trial counsel declined to pursue an IPB defense. That fatally undermines defendant's ineffective assistance of counsel claim on appeal because there are readily hypothesized rational tactical reasons to forgo such a defense.

Here is but one example. Defendant's trial attorney, in argument and in the selection and questioning of witnesses (including defendant), appears to have pursued a strategy of portraying his client as an honest person and a responsible

19

mother, who, on October 17, 2018, had no inkling that Norwood would beat and kill Abel. On direct examination, defendant testified Norwood was a "pretty good" young father. She asserted she never witnessed Norwood abuse their son nor saw any after-effects of such abuse, such as bruising. Defendant also testified that she herself had never suffered any abuse at Norwood's hands.[8] Defendant's testimony was bolstered by her four character witnesses, each of whom testified defendant was truthful and trustworthy and none of whom contradicted defendant or Shirley's testimony about the absence of any child abuse or domestic violence. The defense argued that the fatal injuries inflicted on Abel were therefore entirely unexpected, and if believed, that would have likely resulted in an outright acquittal rather than conviction of a lesser manslaughter offense.[9] That sort of all-or-nothing strategic judgment has been

---

[8]    Defendant's testimony on direct was consistent with Shirley's testimony that, while living with the family for a year in the relatively close quarters of a mobile home, she never saw any abuse of Abel by either of his parents or of her granddaughter by Norwood.

[9]    Expert testimony about IPB and its psychological effects would have been at odds with key elements of this approach. Although it would have offered a possible explanation for defendant's contradictory statements to the police and perhaps salvaged some credibility with the jury, it would also confirm that defendant was well-aware of Norwood's violent nature (and the drug use that fueled it) and, notwithstanding that knowledge, did nothing to protect her son from Norwood on both October 17 and on the days preceding Abel's fatal injury. In any case, as our Supreme Court has explained, "[f]ailure to argue an alternative

20

routinely held to fall within the wide range of professional competence (not to mention the range of reasonable strategic choices for a defendant personally to prefer). (See, e.g., *People v. Wade* (1988) 44 Cal.3d 975, 989; see also *People v. Cunningham* (2001) 25 Cal.4th 926, 1007 ["counsel does not render ineffective assistance by choosing one or several theories of defense over another"].)

### B. The Trial Court Had No Sua Sponte Duty to Instruct on Voluntary Manslaughter Based on Imperfect Self-Defense

#### 1. Applicable law

"'It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case.' [Citations]." (*People v. Diaz* (2015) 60 Cal.4th 1176, 1189.)

A trial court has a sua sponte duty to instruct the jury on a lesser included offense "whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury." (*People v. Breverman* (1998) 19 Cal.4th 142, 162; see also *id.* at 154 [trial court must provide "'instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence

---

theory is not objectively unreasonable as a matter of law." (*People v. Thomas* (1992) 2 Cal.4th 489, 531.)

that the offense was less than that charged"].)  "This substantial evidence requirement is not "'satisfied by *any* evidence . . . no matter how weak,'" but rather by evidence from which a jury composed of reasonable persons could conclude 'that the lesser offense, but not the greater, was committed.'"  (*People v. Avila* (2009) 46 Cal.4th 680, 705 (*Avila*); accord *People v. Landry* (2016) 2 Cal.5th 52, 96.)

We review de novo a claim the trial court erred by failing to instruct on a lesser offense, construing the evidence in the light most favorable to the defendant.  (*People v. Licas* (2007) 41 Cal.4th 362, 366; *People v. Brothers* (2015) 236 Cal.App.4th 24, 30.)

> 2.  *An instruction on voluntary manslaughter was not required because the evidence at trial showed defendant acted out of duress, not imperfect self-defense*

Imperfect self-defense applies when "the defendant killed the victim in the unreasonable but good faith belief in having to act in self-defense."  (*People v. Barton* (1995) 12 Cal.4th 186, 201.)  While imperfect self-defense does not justify a homicide, it may reduce murder to voluntary manslaughter by negating the element of malice required for murder.  (*People v. Randle* (2005) 35 Cal.4th 987, 994.)

Here, defendant claims the jury should have been instructed on imperfect self-defense because she feared Norwood would harm or kill her if she reported his abuse of Abel.  This, however, is not a claim of imperfect self-defense; rather, it is at best a claim of duress, which, as our Supreme Court has held, can neither justify nor mitigate murder.  (*People v. Anderson* (2002)

22

28 Cal.4th 767, 780, 783 (*Anderson*); accord, *People v. Hinton* (2006) 37 Cal.4th 839, 882-883 ["'[D]uress is not a defense to *any* murder' (*People v. Maury* (2003) 30 Cal.4th 342, 421, [ ]) and, in particular, does not negate malice"].) "In contrast to a person killing in imperfect self-defense, a person who kills an innocent believing it necessary to save the killer's own life intends to kill unlawfully," and "[n]othing in the statutes negates malice in that situation." (*Anderson, supra,* at 783.) Accordingly, even if there is good evidence defendant feared Norwood, that evidence is not evidence that could support an imperfect self-defense finding. Defendant was accused and convicted of aiding and abetting the killing of Abel, not killing Norwood (the person whom she assertedly feared).

Defendant recognizes we are bound by our Supreme Court's holding in *Anderson* distinguishing duress from imperfect self-defense but she cites Justice Kennard's concurring and dissenting opinion in that case to argue duress should be a defense to second-degree murder. Defendant can pursue that argument with our Supreme Court if she chooses, but we reject it.

C. *Sufficient Evidence Was Presented at Trial to Establish the Requisite Intent for Second Degree Murder*

"When the sufficiency of the evidence to support a conviction is challenged on appeal, we review the entire record in the light most favorable to the judgment to determine whether it contains evidence that is reasonable, credible, and of solid value from which a trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] Our review must presume in support of the judgment the existence of every fact the jury could

23

reasonably have deduced from the evidence. [Citation.] . . . [T]he relevant inquiry on appeal is whether, in light of all the evidence, '*any* reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt.' [Citation.]" (*People v. Zaragoza* (2016) 1 Cal.5th 21, 44.)

Murder is the unlawful killing of a human being "with malice aforethought." (§ 187, subd. (a).) At trial, the prosecution relied on a theory of implied malice to support a conviction for second degree murder. "'Malice is implied when the killing is proximately caused by "'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.'"'" (*People v. Cravens* (2012) 53 Cal.4th 500, 507; accord, *People v. Jones* (2018) 26 Cal.App.5th 420, 442-443.)

In *People v. Rolon*, a different division of this court explained "parents have a common law duty to protect their children and may be held criminally liable for failing to do so." (*People v. Rolon* (2008) 160 Cal.App.4th 1206, 1219 (*Rolon*).) Thus, "a parent who knowingly fails to take reasonable steps to stop an attack on his or her child may be criminally liable for the attack if the purpose of nonintervention is to aid and abet the attack." (*Ibid*.) "[S]uch intentional conduct . . . can support liability for [second degree] murder." (*Ibid*.)

The *Rolon* court held there was sufficient evidence to convict the defendant of second degree murder because she "did not take every step reasonably necessary under the circumstances to protect her [one-year-old] son" from his father who beat him to death. (*Id*. at 1221 ["She made no effort to aid her son: she did not scream, call 911, ask a neighbor to help or

24

call for help, or do anything else. Instead, she went to sleep and left her son alone with Lopez although she knew Lopez had recently punched him and thrown him against a wall. From this evidence, a reasonable jury could infer that appellant was capable of taking some action to protect her child and that she chose not to do so, but to go to sleep and leave her son alone with Lopez"].) Other courts have also affirmed second degree murder convictions obtained against parents for the death of their children. (*People v. Latham* (2012) 203 Cal.App.4th 319, 327-334 [sufficient evidence supported parents' second degree murder conviction for their failure to provide their teenage daughter with medical care]; *People v. Burden* (1977) 72 Cal.App.3d 603, 609-610, 614, 616 [affirming the defendant's conviction of second degree murder where he admitted not feeding his child and knowing his wife was not feeding their child adequately].)

Here, defendant knew from the start of her relationship with Norwood that he was a methamphetamine addict who got high frequently even after his son was born. There was also ample evidence she knew that when he was high, Norwood could be mean and abusive. Norwood threatened Abel's life while defendant was pregnant and, after his birth, there was evidence defendant witnessed Norwood mistreating her son in a variety of ways prior to October 17: squeezing Abel hard enough to crack a rib, shaking his head, banging his head into objects, and covering his mouth in order to get him to stop crying. In addition, on multiple occasions she heard loud bangs, which she knew were not innocent or accidental, coming from the room where Norwood was caring for Abel unobserved.

Despite this evidence that defendant knew Norwood was abusing Abel, defendant did nothing to stop the abuse and

25

continued to allow Norwood, while high, to care for her son. On October 17, the day Abel suffered his fatal injuries, defendant knew Norwood was high on methamphetamine and angered because of their argument over his drug use; nonetheless, she allowed Norwood to be Abel's primary caregiver that day, even though there was a likelihood Abel would be more fussy than usual as a result of his vaccination shots the day before. Even after she heard a loud and troubling bang from the room where Norwood was caring for Abel alone and no corresponding cry from Abel, defendant did nothing; she remained on the couch until long after Norwood left the family home in an antsy and atypical manner before belatedly checking on her son's well-being. Then, following Abel's hospitalization, defendant protected Norwood (at his direction) by lying to the police about sundry matters: the hypodermic needle, the possibility of Shirley being responsible for Abel's injuries, and Norwood's prior abuse of her and her infant son. From this and other evidence presented that we find it unnecessary to summarize, a reasonable juror could find defendant, by inaction and even some affirmative actions, knowingly failed to protect her son and thereby aided and abetted Norwood's murder of Abel.

### D. Defendant Forfeited Her Challenge to the Fees and Assessments Imposed

Relying on *Dueñas, supra,* 30 Cal.App.5th 1157, defendant argues the imposition of court operations assessments, conviction assessments, and a restitution fine was improper because the trial court did not first hold a hearing on her ability to pay. Defendant was sentenced on November 18, 2020, nearly two years after the *Dueñas* Court issued its opinion. Defendant

26

concedes her attorney did not object to any of the fees or assessments at sentencing. The point is accordingly forfeited. (*People v. Flowers* (2022) 81 Cal.App.5th 680, 687; see also *In re Sheena K.* (2007) 40 Cal.4th 875, 880-881.)

DISPOSITION

The judgment is affirmed.


NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS



BAKER, J.

We concur:



RUBIN, P. J.



MOOR, J.