Filed 11/29/23  P. v. Wilson CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>　　v.<br><br>ROSIE LEE WILSON,<br><br>　　　　Defendant and Appellant. | B323331<br><br>(Los Angeles County<br>Super. Ct. No. MA064056-02) |

APPEAL from an order of the Superior Court of Los Angeles County.  Daviann L. Mitchell, Judge.  Affirmed.

Nancy L. Tetreault, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

Defendant and appellant Rosie Lee Wilson appeals the denial of her petition for resentencing on her second degree murder conviction.  We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

I.    **Procedural History**

Wilson was convicted of second degree murder and felony child abuse (Pen. Code,[1] §§ 187, subd. (a), 273a, subd. (a)) of her 22-month-old son Anthony Wilson, with the additional finding that in committing the child abuse Wilson personally caused or permitted her son to suffer unjustifiable physical pain or injury that resulted in death (§ 12022.95).  Wilson was sentenced to 15 years to life in state prison.  We affirmed Wilson's conviction on appeal.  (*People v. Wilson* (Mar. 27, 2019, B284691 [nonpub. opn.].)

On October 22, 2020, Wilson filed a petition for resentencing pursuant to former section 1170.95, now recodified as section 1172.6.  (Stats. 2022, ch. 58, § 10.)  The trial court found Wilson had established a prima facie case, and in June 2022, it conducted a section 1172.6, subdivision (d)(3) evidentiary hearing.

At the evidentiary hearing, the trial court considered the transcripts of the testimony presented at trial and the trial exhibits.  It also heard live testimony from several witnesses.  The trial court denied Wilson's petition on the ground that she was guilty of aiding and abetting second degree murder under a theory of implied malice.  Wilson appeals.

---

[1]    Undesignated statutory references are to the Penal Code.

## II.    Evidence Presented at Trial

The Attorney General has requested that the court take judicial notice of the entire record of Wilson's trial. We grant the request. (Evid. Code, §§ 452, 459.)

Wilson, born in 1993, attended special education classes and did not complete high school. She had her first child, G.R., in 2010, and gave birth to Anthony in 2012, when she was 18 years old.

In 2014, Wilson, her children, and her new boyfriend Brandon Williams lived in the home of Colleen Brydie. Williams was jealous and got very angry with Wilson, and he yelled and cursed at Wilson and her children. Williams hit Wilson at least once. After Williams moved in, Brydie began noticing an increasing number of bruises on Anthony, but she thought G.R. had caused them.

As of July 21, 2014, Anthony was a normal child: he was vibrant and playful, and he walked, ran, and played. In early August 2014, Brydie noticed Anthony was limping. Wilson told Brydie something seemed wrong with Anthony, and Brydie encouraged her to take Anthony to the hospital, but Wilson did not want to do that because the children had just been returned to her custody and she did not want to lose custody again.

On August 21, 2014, at approximately 8:00 p.m., Wilson left her children with Williams and went out with Brydie to a karaoke bar. That evening, Williams phoned Wilson, and she answered the call. She returned home at 11:00 p.m. or midnight.

The next day, August 22, 2014, at approximately 12:30 p.m., Wilson and Williams took Anthony to the hospital. Anthony was immediately identified as in critical condition, and he was brought directly into the trauma room to see physician

3

Charles Otieno.  Anthony was unconscious and seizing, suggesting he had a severe head injury.  He was "posturing," meaning that his hands were stiff, his feet were stiff and rotated outwards, and his eyes were "deviated."

X-rays showed Anthony had older fractures to his left clavicle and one rib; he was also missing a tooth, which was later found inside his abdomen.  He had abdominal bruises indicative of internal injuries.  Anthony had bruises on his forehead, below his eyes, on the back of his head, on his back, on his torso, on his penis and testicles, and on his buttocks; some were fresh and some were older.  There was an abrasion on his lip.  His buttocks were caked with baby powder.

Anthony's injuries were caused by child abuse and were not accidental.  His prognosis was poor when he was brought to the hospital.  If he had been brought to the hospital sooner, before his brain bleeding had progressed so far, his chances of recovery would have been "far much better."  The delay in bringing him to the emergency room exacerbated his injuries.

The neurosurgeon who examined Anthony found he had a large hematoma on his head and dilated pupils, which indicated his brain stem was no longer controlling his eyes.  Part of Anthony's skull was removed to alleviate the pressure on his brain.  The neurosurgeon opined that Anthony's injury resulted from major trauma, not a slip and fall.

Anthony was hospitalized for 45 days and died October 5, 2014.  Anthony's death was ruled a homicide, and his cause of death was "a sequelae of traumatic injuries, primarily a head injury, but with a contributing role from multiple fractures."  He had suffered "blunt force head trauma, severe, acute right subdural hemorrhage, large, brain swelling, hypoxic ischemic

4

brain injury, chronic subdural membrane, bilateral, and a large external stem herniation of the right cerebrum," as well as a chronic subdural hemorrhage to one eye.

A specialist in child abuse pediatrics opined Anthony's injuries were caused by abuse and were not the result of an accident. He had suffered a traumatic brain injury causing bleeding and brain tissue damage. If Anthony had been brought to the hospital around 11:30 p.m. the night before, rather than at 12:22 p.m. the next day, he would have had a better chance to survive because the bleeding in his head could have been treated before it caused such extensive brain injuries.

### A. *Wilson's Statements and Conduct*

#### 1. <u>Statements to Medical Professionals</u>

After Anthony arrived at the hospital, Wilson told Dr. Otieno Anthony had slipped on water and fallen when she was not home. She reported Anthony was alert and said "hi" to her when she got home at approximately 11:00 p.m., but she also expressed concern about a possible seizure. Wilson said she had looked up seizures on the internet. She reported giving Anthony a bath and placing him in front of a cooling unit because he had a fever. Dr. Otieno found Wilson's account inconsistent because a child of Anthony's weight and size could not suffer the kind of injury he had suffered simply from falling from a height of three feet.

At approximately 1:20 p.m., Nurse Vicki Johnson advised Wilson that Anthony was in critical condition and needed to be transferred. Wilson said Anthony had been "normal" at 10:30 p.m. on August 21, 2014, when she went to bed. Anthony did not appear "right" when she checked on him at approximately 6:00

5

a.m., so she and Williams took him to the hospital. Johnson pointed out she did not bring Anthony to the hospital for more than six hours after 6:00 a.m., and Wilson responded, "Oh." Wilson did not appear overly concerned for Anthony.

### 2. Conduct at Hospital

Registration clerk Virginia Melendez, who registered Anthony at the emergency room, observed Wilson was busy on her phone and mostly paid attention to Williams. Wilson slapped G.R. on the head, hit her on the buttocks, and pulled her.

Wilson's mother Christina Harper and Wilson's three sisters, Luevnia Wilson, Celina Parra, and Christina Wilson, all came to the hospital.[2] When asked what happened, Wilson was defensive and feigned crying, but she did not shed tears. Luevnia thought Wilson's crying was an act—there was no emotion behind it. Wilson looked at her phone while her family prayed for Anthony. Luevnia testified, "[W]e were praying for a child that's in the hospital and in a horrible condition and it seemed to be that she didn't care."

Parra believed Wilson was lying about what happened to Anthony and covering for Williams or herself. Parra also noticed Wilson using her phone while the others prayed, which upset her because Wilson "should have been worried about Anthony. Why would she be texting somebody?"

Christina told Wilson she did not believe her account. Wilson's affect was "stone cold." Christina was bothered that Wilson texted while everyone else was praying.

---

[2] For clarity, we use first names when referring to Luevnia and Christina.

### 3. First Interview with Detective Velazquez

Wilson was interviewed by Detective Susan Velazquez twice on August 22, 2014. During the first interview, Wilson said she left her two children with Williams and went grocery shopping at Walmart at 9:00 p.m., returning at 10:20 p.m. Williams telephoned her and said he had given the children water and put them in the living room while he washed dishes. He heard a "thump," and when he ran to the living room, Anthony was wet and crying. First, Wilson reported Williams picked him up and changed his clothes. Later, she said Williams gave Anthony two or three cold baths.

This was the first time Anthony had fallen. When Wilson got home, Anthony looked fine, was conscious, and said, "[H]i, mom."

Wilson asked Williams if he was sure Anthony was fine. She asked, "Are you sure we shouldn't take him tonight?"

Williams said, "[W]ell, not tonight. Take him tomorrow." Williams said they should monitor Anthony overnight, and if he was not okay the following day, they would take him for medical care.

Wilson said, "Okay, babe," and then stayed up all night watching Anthony. She knew children who bumped their heads should not go to sleep right away. She said, "Honestly, I think that I should have just brought him [to the hospital] last night."

Wilson said she kept Anthony awake during the night. She and Williams each gave Anthony two cold baths, and they put him near the air conditioner to wake him up. Wilson said that about 30 minutes later, Anthony said he wanted to go to sleep, and they allowed him to go to sleep around 10:40 p.m. At that time, Anthony was "perfectly fine." Wilson undressed him, and

there were no marks on him except some little specks on his back, which she thought were from the tile. Wilson changed Anthony's diaper at about 11:40 p.m. and did not see bruises.

Wilson watched Anthony until 10:00 a.m. the next morning. She researched epilepsy symptoms and seizures on her phone because when Anthony was asleep, his eyes "were closed, but it was like he, like he wasn't, you know, like—I don't know. You know how babies, like some babies, they sleep with their eyes half open?" Wilson said, "That's what I thought it was."

At 10:00 a.m., she stepped away to feed G.R., and when she returned, also at 10:00 a.m., Anthony was in a "seizure position" and was unresponsive. The back of his head was red, and the front of his head was turning purple. She had thought the fall was not serious, but when she saw Anthony in the morning, she said, "I was like, oh, my God. Like, okay, he needs to go to the doctor's." Wilson described herself as "freaking out" when she saw Anthony in seizure position: "And I'm like, oh, my God, you know, what's wrong with him?" She thought he might have a concussion from hitting the tile floor.

Wilson said she packed a bag and took Anthony to the hospital. She changed Anthony's diaper at approximately 10:00 a.m., right before leaving for the hospital, at which time she did not see any bruises on his buttocks. Wilson did not call 911 because she wanted to take him to the hospital rather than him going without her in an ambulance. She said she "rushed" Anthony to the hospital as soon as she saw him in the morning, but she also reported that they did not arrive the hospital until 12:00 p.m. or 1:00 p.m., because on the way to the hospital she stopped to get food for G.R., who was hungry.

Wilson said Williams had been up all night with her, and he had been "freaking out. We've been crying. Praying all night. Anything you can name, we've been doing. Trying to see what it was. We tried to monitor him to see if it would go away by tomorrow."

Wilson and Williams had been living together and dating for more than two months. Williams was very good with the children and never got frustrated. She did not believe he would hurt them. When shown photographs of bruises on Anthony's buttocks, Wilson suggested G.R. might have caused them.

### 4. Meeting between Williams and Wilson

Detective Velazquez interviewed Williams who confessed to punching Anthony five times in the back of the head because he would not stop crying. He also admitted to hitting Anthony before August 21, 2014. After interviewing Williams, Velazquez brought Wilson and Williams together. Velazquez wanted Williams to tell Wilson what he had said so Wilson would know the truth had come out. Wilson yelled and cried, but Velazquez was unsure whether she was reacting to the information or to the fact that everything was now known and she was frightened for herself.

### 5. Second Interview with Detective Velazquez

Later on August 22, 2014, Detective Velazquez spoke with Wilson, her mother, and two of her sisters. Wilson told her family Williams had confessed to punching Anthony five times in the head.

Wilson looked at a photograph of bruises on Anthony's buttocks and denied having seen them. She said she had been shopping at Walmart the night before, and said that when she

9

got home, Anthony "didn't have that on him." When asked how she could have missed seeing the bruises if she had changed his diaper that morning, Wilson said she wiped Anthony from a different angle. She admitted noticing Anthony's injured lip.

Wilson's mother Christina Harper told Wilson to tell the truth and stop "covering up." Her sister Luevnia told Wilson they knew Anthony had been unconscious. Wilson denied he had been unconscious and maintained he said "[H]i, mom," to her.

Wilson said the previous evening she had noticed some redness and bruising on Anthony while Williams changed his diaper. Williams said Anthony had fallen near the pool. Wilson asked Williams if he hit Anthony. Williams said he fell. Wilson wanted to take Anthony to the doctor right away, but Williams said Anthony was fine, they should monitor him, and he was sleeping.

In the morning, Wilson saw bruises on Anthony's buttocks and asked if someone had hit him. Williams said no, and told Wilson she could not take Anthony to the doctor because a doctor would think she had caused the bruises. Williams said that if asked, he would blame Wilson. Wilson said, "I'm taking my son to the doctor[,] he's not looking good."

Wilson claimed she did not know Williams was abusing Anthony, but she also admitted she had seen bruises before and that if a child fell, he or she would be bruised on the elbows and knees and not just on the buttocks.

Wilson had not noticed that Anthony had a tooth missing; his teeth were "grinded together and [she] couldn't open them." Wilson thought he was having a seizure, and she did not call 911 because she thought she could help him. Wilson admitted she

was wrong for not calling 911, but she did not think it was serious until the morning.

### 6. Interview with Jacqueline Lewis

Department of Children and Family Services (DCFS) social worker Jacqueline Lewis interviewed Wilson on August 25, 2014. Wilson told Lewis she had been at a karaoke bar on August 21, 2014, when she was notified of Anthony's injuries by text message from Williams. She went home, where she first looked for her cosmetics so she could do her makeup because a producer she met at the bar was coming over. Then she checked on Anthony, who looked up at her and said, "Hi, Mommy." She watched him all night. He whimpered when she bathed him, but she did not see any bruises while she bathed him. In the morning Wilson noticed bruising on Anthony at approximately 7:30 a.m., and she took him to the hospital around noon.

### 7. Third Interview with Detective Velazquez

On August 26, 2014, Wilson told Detective Velazquez that three weeks earlier, after she left Anthony with Williams and Brydie and went to a karaoke bar, she noticed bruises on Anthony's buttocks. Williams said Anthony fell by the pool. After the incident, all Anthony wanted to do was lie down; he did not want to eat or drink, and he was not using one arm. Wilson said Anthony's broken arm and leg were possibly the reason he did not want to walk. Wilson did not take Anthony to the doctor because she did not want to lose custody of him, and she thought she could make him better.

Wilson lied when she said she was shopping at Walmart; she was at a karaoke bar. She lied because she did not want it to look like she had neglected Anthony or left him with someone

11

who would hurt him.  When she got home that night from the karaoke bar, Anthony did not say, "[H]i, mom."

Wilson did not call 911 because Williams told her not to take Anthony to the doctor and to monitor him overnight instead. In the morning, Williams still did not want to take Anthony to the

B.    *Evidence Involving G.R.*

In March 2011, G.R. was treated at the hospital for a fever. G.R.'s father authorized treatment when Wilson could not be reached.  Wilson agreed to a "voluntary" DCFS case.  She was provided with parenting classes and a teen mother support group.

In June 2012, DCFS received an emergency referral regarding G.R.  A social worker went to the motel room where Wilson, G.R., and a man were staying.  There was a strong odor in the garbage-strewn room and the bed was soiled.  There was no baby food, just a dirty baby bottle with a thick, clumped substance inside.  G.R., one and one-half years old, was underweight, small for her age, dirty, could not feed herself, and could neither crawl nor walk.  Her speech was delayed.  Neither Wilson nor the man seemed to be concerned that G.R. was in danger of falling off the bed, and G.R. eventually fell and hit her head.  Her diaper bag was dirty and contained old milk, old bottles, and dirty clothes.  G.R. was taken into protective custody.

Lewis, the social worker who responded to the hospital on August 22, 2014, observed that G.R. was basically nonverbal, dirty, disheveled, and had difficulty walking.  G.R. was withdrawn and jumpy, and she did not respond to questions. G.R. had abrasions on one foot and behind one ear, multiple scars and faint redness on her forehead, and multiple linear scars on

12

her chest and upper arms. There was a discoloration on her abdomen. Her right arm had linear discoloration marks, redness on the forearm, scarring and an abrasion by the elbow, and a round red mark. She had marks on her thigh and knees. On her back, she had redness near her neck, multiple faded discoloration marks, and scars and marks in several areas.

III. **Live Testimony at the Evidentiary Hearing**

Virginia Melendez testified she was working at the hospital when Anthony and the family arrived. G.R. waved at her and Melendez waved back. When Wilson noticed the waving, she forcefully slapped the back of G.R.'s head and pulled her away by the arm. Melendez observed Wilson and Williams laughing, kissing, and looking at a cell phone. Wilson was focused on her phone and on Williams; she did not ask about Anthony, cry, or display any emotion concerning her son. Melendez was haunted by the incident "[b]ecause an innocent kid was dying and the mother wasn't concerned about what was going on."

Wilson's sister Luevnia testified that about one month before Anthony died, she invited Wilson and the children over, but Wilson said G.R. was sick. She invited them again two weeks later, but Wilson said Anthony was sick. Wilson never said Anthony was injured or that anyone was abusing him.

Luevnia testified Wilson appeared nonchalant, unbothered, and unconcerned at the hospital. During the family's prayer circle Wilson was texting on her phone. Wilson pretended to cry: she moaned, but she had no tears in her eyes. When Williams arrived at the hospital, Luevnia had to be restrained from attacking him. Wilson did not confront Williams.

Luevnia opined Wilson knew the difference between right and wrong on August 21, 2014. She believed Wilson knew at that

13

time that she should take Anthony to the hospital if he was injured, and she knew she was delaying Anthony from receiving the medical care he needed.

Wilson's mother Christina Harper testified Wilson was "pretty emotionless" and did not cry at the hospital. On cross-examination, Harper testified Wilson had always acted inappropriately for her age and younger than she actually was. She still used baby talk at the age of 17. She had learning and emotional difficulties, and she never displayed emotions appropriate to events. It was difficult to gauge where she was emotionally.

DCFS social worker Jacqueline Lewis testified that when she advised Wilson on August 25, 2014, that Anthony's death was imminent, Wilson stared blankly and showed no emotion.

Detective Velazquez testified as well. She interviewed Wilson multiple times. Wilson disclosed that approximately three weeks prior to the fatal abuse of Anthony, she came home from karaoke and found Anthony had been injured. He had bruises on his buttocks, lower back, ear, stomach, head, and arms. He was missing hair, and he limped. Anthony was not really moving, would not eat, and could not feed himself; Wilson kept him on the couch watching cartoons. Wilson photographed Anthony's injuries, but she did not seek medical care for him because she had a prior dependency case and did not want DCFS to take away her children. Wilson regretted not obtaining medical care for Anthony.

In a later interview, Wilson told Velazquez that on the night of August 21, 2014, she had gone out to karaoke. Williams telephoned her and told her Anthony had fallen and she needed to come home. She did not go home right away because she felt

14

Williams was taking care of the children.  When she did go home, she found Anthony was injured.  She looked on the internet for information about seizures and other conditions to determine what was wrong with him.  She took him to the hospital around noon on August 22, 2014, after she put makeup and baby powder on his buttocks.

Wilson called one witness, her aunt Angela Wilson, who testified that she lived with the extended family for about one month.  Wilson had a "great relationship" with her children and did a "great job" caring for them.  Wilson was hyperactive at times and could not focus.  By the night of Anthony's injuries, Angela Wilson was no longer in touch with Wilson.

## DISCUSSION

I.  **Applicable Law**

Effective January 1, 2019, Senate Bill No. 1437 (2017–2018 Reg. Sess.) amended the felony murder rule and the natural and probable consequences doctrine as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.  (Stats. 2018, ch. 1015, § 1, subd. (f).)  Senate Bill No. 1437 amended section 188 to require that a principal "shall act with malice aforethought.  Malice shall not be imputed to a person based solely on his or her participation in a crime."  (§ 188, subd. (a)(3).)

Senate Bill No. 1437 also added what is now section 1172.6, providing a procedure by which those convicted of murder under the former law can seek retroactive relief if the amendments affect their previously sustained convictions.  (Stats. 2018,

15

ch. 1015, § 2; Stats. 2022, ch. 58, § 10.)  When a petitioner files a section 1172.6 petition, the court first appoints counsel and then conducts a prima facie analysis of the petitioner's eligibility, with briefing from the parties.  (§ 1172.6, subd. (c); *People v. Lewis* (2021) 11 Cal.5th 952, 961–970.)  If the trial court finds a prima facie showing because there is no indication that the petitioner is ineligible for relief as a matter of law, the court must issue an order to show cause why relief should not be granted.  (§ 1172.6, subd. (c).)

At the evidentiary hearing on the order to show cause, the burden of proof is on the prosecution "to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (d)(3).)  The court may consider evidence admissible under to the Evidence Code and "evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed.  The court may also consider the procedural history of the case recited in any prior appellate opinion.  However, hearsay evidence that was admitted in a preliminary hearing pursuant to subdivision (b) of Section 872 shall be excluded from the hearings as hearsay, unless the evidence is admissible pursuant to another exception to the hearsay rule.  The prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens." (§ 1172.6, subd. (d)(3).)  The trial court acts as an independent factfinder.  (*People v. Clements* (2022) 75 Cal.App.5th 276, 293-294.)

16

On appeal, unless there is a question as to the trial court's understanding of the elements of the crime, "a trial court's denial of a section 1172.6 petition is reviewed for substantial evidence. [Citation.] Under this standard, we review the record ' " 'in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " ' " (*People v. Reyes* (2023) 14 Cal.5th 981, 988 (*Reyes*).)

II.  **Second Degree Murder Liability**

Under current law, subject to exceptions not applicable here, second degree murder requires a finding of express or implied malice. (§ 188, subd. (a)(1), (2).) Express malice is defined as the intent to unlawfully kill, and it requires a showing that the assailant either desires the death or knows, to a substantial certainty, that death will occur. (*People v. Smith* (2005) 37 Cal.4th 733, 739.) Implied malice requires knowledge that conduct endangers the life of another, a conscious disregard for life, and the performance of an act, the natural consequences of which are dangerous to life. (*People v. Chun* (2009) 45 Cal.4th 1172, 1181 (*Chun*), superseded by statute on other grounds as stated in *People v. Lamoureux* (2019) 42 Cal.App.5th 241, 247-249.)

A person may also be criminally liable for murder as a direct aider and abettor if the person has knowledge of the direct perpetrator's intent to commit the crime; the intent to assist in committing the crime; and conduct that in fact assists in committing the crime. (§ 31; *People v. Perez* (2005) 35 Cal.4th 1219, 1225.) An aider and abettor must know of and share the direct perpetrator's intent; to aid and abet an express malice

17

murder the aider and abettor must share the actual perpetrator's intent to kill. (*People v. McCoy* (2001) 25 Cal.4th 1111, 1118 & fn. 1.) An aider and abettor who does not expressly intend to aid a killing can still be convicted of second degree murder if the person knows his or her conduct endangers the life of another and acts with conscious disregard for life. (*Reyes*, *supra*, 14 Cal.5th at p. 990.)

## III. **Direct Liability**

Substantial evidence supports the trial court's determination that Wilson is guilty beyond a reasonable doubt of second degree murder under both direct liability and aiding and abetting theories.

### A. *Actus Reus*

" 'In the context of implied malice, the actus reus required of the perpetrator is the commission of a life endangering act.' " (*Reyes*, *supra*, 14 Cal.5th at p. 991.) Wilson's repeated failure to obtain medical attention for Anthony, whom she knew was unconscious and severely injured, over a period exceeding 12 hours, was an act, the natural consequences of which are dangerous to life.

On August 21, 2014, Wilson knew that Williams had recently injured Anthony badly while taking care of him: a few weeks earlier, after being in Williams's care, Anthony had numerous bruises from head to buttocks, was limping and moved very little, and could not feed himself. Wilson had found Anthony's previous injuries serious and problematic enough that she documented them by taking pictures. Yet not only did she leave Anthony with Williams again, she did not immediately

18

return home from the karaoke bar when Williams called and urged her to come home because Anthony was hurt.

When Wilson did go home, at approximately 11:00 p.m., Anthony was unconscious. Williams told her he had performed CPR on him. She noticed redness and bruising on Anthony when his diaper was changed. Wilson told Williams they should take Anthony to the doctor, but he did not want to, and they did not take Anthony for any medical treatment. They spent the night "crying. Praying all night. Anything you can name, we've been doing. Trying to see what it was. We tried to monitor him to see if it would go away by tomorrow."

When Wilson saw Anthony in the morning, her reaction was that he needed to be seen by a doctor. At approximately 6:00 a.m., Wilson checked on Anthony and he did not appear "right." At about 7:30 a.m., she noticed bruises on his buttocks. At around 10:00 a.m., Wilson saw Anthony was in what she described as a "seizure position" and was unresponsive. The back of his head was red and the front of his head was turning purple. Wilson "freak[ed] out," describing herself as asking, "[W]hat's wrong with him?" Yet Wilson did not take Anthony to the hospital until approximately 12:30 p.m. This evidence supports the conclusion that for more than 12 hours, Wilson delayed seeking medical care for her unconscious and seriously-injured 22-month-old child.

Based on *People v. Knoller* (2007) 41 Cal.4th 139, Wilson argues that the prosecutor was required to prove she engaged in conduct that posed a high probability of death to Anthony. This is not the law. In *Knoller*, the California Supreme Court held that "the trial court set the bar too high" when it ruled "implied malice requires a defendant's awareness that his or her conduct

19

had a high probability of resulting in death." (*Id*. at p. 143, italics omitted.) Implied malice, the Supreme Court ruled, "requires a defendant's awareness of engaging in conduct that endangers the life of another—no more, and no less." (*Ibid*.)

B.  *Mens Rea*

For direct perpetrator liability for implied malice murder, " 'The mental component is the requirement that the defendant "knows that his conduct endangers the life of another and . . . acts with a conscious disregard for life." ' " (*Chun, supra,* 45 Cal.4th at p. 1181.)

The evidence was sufficient to support the mens rea element as a direct perpetrator. There was evidence that Wilson understood that not taking Anthony to the hospital endangered his life. When she came home from the karaoke bar, Wilson found Anthony unconscious and learned Williams had given him CPR. She saw Anthony's redness and bruises and thought he had suffered a seizure. "[E]vidence that [the victim] displayed clearly visible signs of an extremely serious medical condition supports the inference that appellants were aware of the life-threatening nature of [the victim's] condition." (*People v. Latham* (2012) 203 Cal.App.4th 319, 332 (*Latham*).) Wilson also later admitted to the police that she knew she was wrong for not calling 911, which supports the conclusion that she knew not seeking immediate medical attention for Anthony endangered his life.

Wilson also argues, based on *People v. Caffero* (1989) 207 Cal.App.3d 678 (*Caffero*), that the failure to fulfill her parental obligation to protect her child "does not suffice as evidence a parent engaged in life endangering conduct toward the child." *Caffero* involved a child who died from a bacterial

infection that was introduced to her system through extremely severe perianal sores. (*Id*. at p. 685.) The murder indictment against the parents was dismissed, and the People appealed. (*Id*. at p. 680.) The Court of Appeal determined that felony child abuse is not inherently dangerous to human life within the meaning of the felony-murder rule and then examined the evidence to ascertain whether it supported the element of malice necessary for a murder charge. (*Id*. at pp. 684–686.) The court concluded that the evidence did not support a finding of implied malice because there was no evidence the parents knew her condition was life-threatening. (*Id*. at p. 685.) When the child arrived at the hospital, she "exhibited no obvious symptoms of her life-threatening condition," to the point that her condition was initially deemed non-urgent by an experienced triage nurse. (*Ibid*.) The Court of Appeal held that "the evidence will not support the inference defendants acted with conscious or wanton disregard for human life," and therefore the elements of implied malice were not met. (*Id*. at p. 686.)

Wilson argues that just as in *Caffero* there was insufficient evidence the parents knew their conduct endangered their child's life, here there was insufficient evidence Wilson knew that failing to obtain medical care for Anthony was a life-endangering act. *Caffero* did not address whether failing to obtain medical care for the child constituted a life-endangering act, the actus reus; it concerned the parents' mens rea, whether they had the "subjective awareness that their acts or omissions endangered the life of their child." (*Caffero, supra*, 207 Cal.App.3d at p. 685.) Factually, the cases are entirely different as well. The child in *Caffero* did not appear to need urgent medical care. Anthony did.

## IV.  Aiding and Abetting Liability

### A.  *Actus Reus*

For the direct aider and abettor, the actus reus includes whatever acts constitute aiding the commission of the life-endangering act.  Thus, to be liable for an implied malice murder, " 'the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering act, not the result of that act.' " (*Reyes, supra*, 14 Cal.5th at p. 991, italics omitted.)  As set out above, appellant aided Williams in the commission of the life-endangering act of denying Anthony medical care.

### B.  *Mens Rea*

For aiding and abetting liability, " '[t]he mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit *the act*, intent to aid the perpetrator in the commission of *the act*, knowledge that *the act* is dangerous to human life, and acting in conscious disregard for human life.' " (*Reyes, supra*, 14 Cal.5th at p. 991.)

The evidence supports the inference that Wilson consciously disregarded the danger to Anthony's life.  Despite knowing Anthony had lost consciousness, had bruises, possibly had suffered a seizure, and had apparently required CPR, she considered taking her unconscious child for medical treatment but chose not to do so because she was covering for Williams and thought she might again lose custody of her children.  By her own admission, she noticed something was seriously wrong with Anthony at 6:00 a.m.  Although she described herself as rushing him to the hospital as soon as she saw him in the morning, in actuality she did not bring him into the hospital until approximately 12:30 p.m.  Her explanation for the delay was that

22

her older child was hungry so they stopped for food on the way to the emergency room.  Wilson's obvious lack of regard for Anthony's fate after she took him to the hospital—she appeared unconcerned, laughed with Williams and kissed Williams in the waiting room, used her cell phone, did not ask about her son, and texted during a family prayer circle—also supports the inference that she acted with implied malice.  (*Latham*, *supra*, 203 Cal.App.4th at p. 332 [evidence parents were "unconcerned" with their child's fate, even after she had suffered cardiac arrest, supported verdict]; *People v. Burden* (1977) 72 Cal.App.3d 603, 620 ["A defendant's lack of concern as to whether the victim lived or died, expressed or implied, has been found to be substantial evidence of an 'abandoned and malignant heart' by the appellate courts of this state"]; *People v. Ogg* (1958) 159 Cal.App.2d 38, 51 ["Defendant's failure to seek the assistance of his friends or to obtain medical aid even though he knew that his wife was seriously injured indicates a heartless attitude and callous indifference toward her"].)  These elements are sufficient to demonstrate direct liability for implied malice murder.

Wilson does not argue the evidence was insufficient that she knew not seeking medical attention for Anthony endangered his life and consciously disregarded that danger, the mens rea required for direct perpetrator liability.  Instead, she argues the evidence was insufficient to support the mens rea necessary to prove implied malice on an aiding and abetting theory because the prosecution did not prove 1) she knew Williams intended to commit life-endangering acts of child abuse, 2) she intended to aid Williams in committing life-threatening abuse, or 3) she acted knowingly to aid Williams in life-threatening child abuse, consciously disregarding the danger to Anthony's life.  However,

23

Wilson's limited focus on a life-endangering act of child abuse ignores Wilson and Williams's life-endangering act of delaying medical care for the seriously-injured Anthony for many hours.

Wilson knew Williams had hurt Anthony badly in the past; indeed, she lied to the police that she was grocery shopping instead of going to a karaoke bar because she was trying to hide that she had left Anthony with a person who would hurt him. She had failed to get medical care for Anthony in the past when Williams hurt Anthony so badly that he could not move or feed himself. On the night of August 21, 2014, Wilson knew Williams did not want to obtain medical treatment for Anthony—when she got home, found Anthony unconscious, and learned Williams had used CPR on him, she did not call 911 because Williams told her not to. She told Williams they should take Anthony to a doctor, but Williams told her he looked fine and they should monitor him instead. The following morning, Williams told Wilson she could not take Anthony to the hospital because the doctor might think she had hurt him—and he said if he was asked, he would blame Anthony's bruises on her. This evidence shows Wilson knew Williams intended to deny Anthony medical attention.

Wilson's conduct supports the inference that she intended to aid Williams in committing the life-endangering act of failing to obtain care for Anthony, apparently in order to cover up Williams's abuse. Wilson did not take Anthony to the hospital, call 911, or obtain medical care for him for 12 hours after he became unconscious. She attempted to hide Anthony's bruises with baby powder and makeup before taking him to the hospital. When Wilson finally did seek attention for Anthony, her lies about how Anthony received his injuries matched Williams's initial account.

24

When combined with Wilson's knowledge that denying Anthony medical treatment was dangerous to human life and her conscious disregard for human life, both discussed above, this evidence is sufficient to demonstrate the mens rea necessary for aiding and abetting liability for implied malice second degree murder.

Wilson argues her failure to obtain medical care for Anthony was due to poor judgment and the fear that DCFS might take the children away from her, not any intent to assist Williams. Poor judgment, fear of DCFS intervention, and the intent to aid Williams are not mutually exclusive. The fact that Wilson can identify other explanations for her actions does not mean the evidence was insufficient to support the inference that she intended to aid Williams. (*People v. Farnam* (2002) 28 Cal.4th 107, 144 [if circumstances "reasonably justify" the fact-finder's findings, "we may not reverse the judgment simply because the circumstances might also reasonably be reconciled with defendant's alternative theories"].)

## V. Wilson's Youth and Intellectual/Emotional Impairments

Wilson argues the trial court erred by failing to "consider the impact of appellant's youth in assessing her culpability," and by "not considering" her cognitive and emotional disabilities when determining whether she intended to aid in a life-threatening act with knowledge the act was dangerous to life and with conscious disregard of the danger. Wilson is incorrect. The trial court expressly considered these factors in ruling on the petition for resentencing. It concluded that despite her youth and intellectual and emotional issues, Wilson knew how to properly care for her children, had the ability to care for them, had been

trained on proper parenting, knew she should take an injured child for medical attention, recognized the risk of not taking Anthony for the immediate medical attention he required, and decided not to obtain care for her child selfishly and with a conscious disregard for human life.  The failure to weigh the evidence in the manner a party urges is not the same as the failure to consider that evidence.

## DISPOSITION

The order denying the petition for resentencing is affirmed.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**



STRATTON, P. J.


We concur:



WILEY, J.



VIRAMONTES, J.

26